# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| TERRENCE K. SUMPTER, *ET AL.*, | * | CIVIL ACTION NO. |
| PLAINTIFFS, | * | |
| | * | |
| V. | * | |
| | * | |
| WILLIAM B. HUNGERFORD, JR., *ET AL.*, | * | |
| | * | |
| DEFENDANTS. | * | JURY TRIAL DEMANDED |
| | * | |
| * * * * * * * * * * * * * * * * | * | |

## VERIFIED COMPLAINT

NOW INTO COURT, through undersigned counsel, come plaintiffs, Terrence K. Sumpter, Suzette P. Lopez, Abbas Barzani, Xue Li, Chong Kee Tan, Sandra Massie, Rong Zhou, Shuhai Li, Junjie Huang, Shuangmei Ge, Seyed Abad and Atefeh Abad, Xiao Tong Zhang, Wenjie Zhan, Li Wang, Li Wei Liu, Su Fang, Tianyi Liu, Ali Fuat Cercer and Faruk Cercer, Suat Ocal and Suheyla Ocal, Yiran Deng, Rong Ma, Ming Chen, Xirui Chen, and Reem Al Nasser(hereinafter, "Plaintiffs"), and for their Complaint against (1) defendants William B. Hungerford, Jr. and Timothy O. Milbrath (hereinafter, the "Individual Defendants"); (2) defendants 3200 Burgundy Street, LLC, Ballard Outreach, LLC, Bartone, LLC, Bay-Algiers-JV, LLC, Bay-Bourbon-Ritas, LLC, Bay-Canal PJs, LLC, Bay-NOLA-Hospitality, LLC, Bay-NOLA-Mgmt, LLC, Bay-NOLA-Ventures-MD, LLC, Bay-One-Capital, LLC, Bay-PJs, LLC, Bay-Tulane PJs, LLC, Bay-Wow Franchise 2, LLC, Bay-Wow, LLC, Bywater Holdings, LLC, Eleanor Holdings, LLC, Maurepas Foods, LLC, Noble-Franchise 1&3, LLC, Noble-Lodging Partners, LLC, Noble Lending Holdings, LLC, NobleOutReach-NOLA, LLC, NobleOutReach, Ltd., LLC, Noble-Employees, LLC, NobleReach-NOLA, LLC, NOP, LLC, Rita's Fajitas

NOLA, LLC, Rita's Tequila Bar Nola, LLC, Timone, LLC, VP Nola 2, LLC, VP Nola 2-WOW, LLC, VP Nola Land 2, LLC, VP Nola, LLC, and NobleOutReach Original Principals, LLC (the "Louisiana Entity Defendants"); (3) NobleOutReach, LLC and Bay-NOLA Ventures MD, LLC (the "Maryland Entity Defendants"); (4) defendants Noble-RealEstate-GP, LLC and Noble-RE-Management, LLC (the "Delaware Entity Defendants"); and (5) defendant NobleRealEstateFund, L.P. (the "Nominal Defendant" or the "Fund"), do respectfully allege and aver as follows:

## NATURE OF THE ACTION

## DERIVATIVE ACTION ON BEHALF OF NOMINAL DEFENDANT

1.      Plaintiffs are limited partners in a fund that was created between December 2006 and May 2007 as a Delaware limited partnership and known as the NobleRealEstateFund, L.P. (the "Nominal Defendant" or the "Fund").

2.      Plaintiffs bring this action on behalf of the Fund, a limited partnership, by way of derivative action for the benefit of the Fund against the defendants identified herein for gross mismanagement, breach of fiduciary duty, intentional interference with contract, conversion of Fund assets, and unjust enrichment.

3.      Defendants William B. Hungerford, Jr. ("Hungerford") and Timothy O. Milbrath ("Milbrath") are the principals of Defendant Noble-RealEstate-GP, LLC ("Noble-RealEstate-GP"), the general partner of the Fund.

4.      At all times material to this Action, Hungerford and Milbrath controlled and made all investment decisions on behalf of the Fund through Noble-RealEstate-GP.

5.     Plaintiffs individually invested $500,000 for limited partnership interests in the Fund (collectively totaling $13.5 million) and paid an additional "service fee" of up to $60,000 each.

6.     The total amount invested in the Fund was $15.5 million through the purchase of limited partnerships interests by 31 investors (including Plaintiffs), each of whom invested $500,000 for the interests they acquired.

7.     Hungerford and Milbrath carried out a scheme to defraud the Fund by diverting the monies invested with the Fund by these investors into separate corporate entities that Hungerford and Milbrath ultimately control.

8.     In fact, Hungerford and Milbrath set-up a complex web of companies to aid and abet them in their scheme to defraud the Fund, including over thirty (30) separate corporate entities formed under the laws of Louisiana, Maryland, and Delaware.

9.     Hungerford and Milbrath induced Plaintiffs to invest in the Fund based on representations that the U.S. Citizenship and Immigration Service ("USCIS") approved a pilot program authorizing foreign nationals who invest $500,000 in certain designated economic entities throughout the United States to obtain U.S. lawful permanent residency (the "EB-5 Immigrant Investor Pilot Program").

10.     Hungerford and Milbrath further contracted with the City of New Orleans to operate what is referred to as a "Regional Center," which is a designation that USCIS approves through an entity that Hungerford and Milbrath formed and controlled at all times material to this action – Defendant NobleReach-NOLA, LLC.

11.     The Fund was supposed to invest in companies and businesses within the designated City of New Orleans Regional Center to create jobs and a positive return on

investment for the Fund's investors in furtherance of their pursuit of residency in the United States through the EB-5 Immigrant Investor Pilot Program.

12.     The fraudulent scheme of Hungerford and Milbrath consisted of systematically misappropriating and/or converting Fund assets by diverting investment money in the Fund to themselves and/or entities that they control.

13.     Hungerford and Milbrath, with the assistance of others, formed over thirty (30) limited liability companies organized under the laws of three different states, namely, Louisiana, Maryland, and Delaware, between 2008 through 2010.  These limited liability companies are named Defendants in this action and the nature in which Hungerford and Milbrath used these entities to carry out their fraudulent scheme is described in detail herein below.

14.     Among a litany of misconduct, Noble-RealEstate-GP, through the actions of Hungerford and Milbrath, acting in concert and collusion with each other and entities that they control:

a.     diverted at least $6 million of Fund monies to themselves for excessive and unwarranted "consulting services";

b.     diverted approximately $3 million of Fund monies that was specifically dedicated and reserved for investment into job-creating enterprises to pay excessive and unwarranted operating expenses of the New Orleans Regional Center's operations, including financing the purchase of real estate in Maryland that benefitted Hungerford and Milbrath;

c.     grossly mismanaged the construction of certain projects situated in New Orleans;

d.     grossly mismanaged the Fund's investments by causing the Fund to pay exorbitant fees for minority ownership interests in sham companies formed, owned and

controlled by Hungerford and Milbrath that do not generate any revenues or provide any legitimate services;

      d.    breached fiduciary duties owed to the Fund; and

      e.    unjustly enriched Hungerford and Milbrath to the detriment of the Fund.

15.    Plaintiffs bring this action to remedy Defendants' wrongful conduct.

16.    In addition, Plaintiffs seek the immediate and permanent appointment of a receiver for the Fund and various of the defendant limited liability companies that Hungerford and Milbrath formed and which they operate, control, and continue to use in furtherance of their fraudulent scheme to misappropriate Fund assets.

17.    Plaintiffs further seek an immediate accounting of the Fund and all defendants to determine where the Fund's assets have been diverted for purposes of recovering such converted assets on behalf of the Fund.

18.    Plaintiffs seek preliminary and permanent injunctive relief against all defendants, and all other persons or entities that acted in concert with them, from performing, making any payment, or from conducting any further activities which are injurious to the continued viability of the Fund as a legitimate investment vehicle.

19.    Although Plaintiffs have not demanded that Noble-RealEstate-GP assert the claims set forth in this Complaint on behalf of the Fund in its capacity as the general partner of the Fund, Plaintiffs should be excused from such a pre-suit demand.

20.    First, the principals of Noble-RealEstate-GP are Hungerford and Milbrath, the same individuals who have conducted the bad acts alleged herein resulting in the depletion of the Fund's assets.

21.    Hungerford and Milbrath are not disinterested and independent parties.

22.     Second, as set forth in detail herein, the alleged transactions at issue were not products of any valid exercise of business judgment.

23.     To the contrary, the alleged transactions were part of a scheme orchestrated by Hungerford and Milbrath to defraud the Fund by diverting its assets into sham companies and ultimately converting Fund monies for their own ultimate personal benefit.

## THE PARTIES

### *Plaintiffs*

24.     Terrence K. Sumpter ("Sumpter") is a citizen of the United Kingdom who currently resides at 13 South Lakewalk Drive, Palm Coast, FL  32137.  Sumpter agreed to become a limited partner in the Fund on or about October 16, 2007 and is presently a limited partner in the Fund.

25.     Suzette P. Lopez ("Lopez") is a citizen of Jamaica who currently resides at 5 Tutty Circle, Sayreville, NJ  08872.  Lopez agreed to become a limited partner in the Fund on or about November 15, 2007 and is presently a limited partner in the Fund.

26.     Abbas Barzani ("Barzani") is a citizen of the Republic of Iraq who currently resides at 903 Georgetown Ridge Court, McLean, VA  22102.  Barzani agreed to become a limited partner in the Fund on or about April 9, 2008 and is presently a limited partner in the Fund.

27.     Xue Li is a citizen of the People's Republic of China who currently resides at 134 Russet Lane, Boxborough, MA  01719.  Li agreed to become a limited partner in the Fund on or about April 14, 2008 and is presently a limited partner in the Fund.

28.     Chong Kee Tan ("Tan") is a citizen of the Republic of Singapore who currently resides at 465 10th Street, Apartment 207, San Francisco, CA  94103.   Tan agreed to become a

limited partner in the Fund on or about May 21, 2008 and is presently a limited partner in the Fund.

29.     Sandra Massie ("Massie") is a citizen of New Zealand who currently resides at 736 West Short Avenue, Lexington, KY  40508.  Massie agreed to become a limited partner in the Fund on or about September 26, 2008 and is presently a limited partner in the Fund.

30.     Rong Zhou ("Zhou") is a citizen of the People's Republic of China who currently resides at 43 Cape Victoria, Aliso Viejo, CA  92956.  Zhou agreed to become a limited partner in the Fund on or about September 30, 2008 and is presently a limited partner in the Fund.

31.     Shuhai Li is a citizen of the People's Republic of China who currently resides at 24 Whispering Wind, Irvine, CA  92614. Shuhai Li agreed to become a limited partner in the Fund on or about May 21, 2009 and is presently a limited partner in the Fund.

32.     Junjie Huang ("Huang") is a citizen of the People's Republic of China who currently resides at 461 Muttontown Eastwoods Road, Syosset, NY  11791.  Huang agreed to become a limited partner in the Fund on or about July 10, 2009 and is presently a limited partner in the Fund.

33.     Shuangmei Ge ("Ge") is a citizen of the People's Republic of China who currently resides at 1705 Oak Street, South Pasadena, CA  91030.  Ge agreed to become a limited partner in the Fund on or about August 3, 2009 and is presently a limited partner in the Fund.

34.     Seyed Abad and Atefeh Abad (collectively "the Abads") are citizens of the Islamic Republic of Iran residing in the United Arab Emirates.  The Abads each agreed to individually become limited partners in the Fund on or about August 18, 2009 and is presently a limited partner in the Fund.

35.     Xiao Tong Zhang ("Zhang") is a citizen of the People's Republic of China who currently resides at 7500 York Drive, St. Louis, MO  63105.  Zhang agreed to become a limited partner in the Fund on or about August 26, 2009 and is presently a limited partner in the Fund.

36.     Wenjie Zhan ("Zhan") is a citizen of the People's Republic of China who currently resides at 162 Hanapepe Loop, Honolulu, HI  96825.  Zhan agreed to become a limited partner in the Fund on or about September 8, 2009 and is presently a limited partner in the Fund.

37.     Li Wang ("Wang") is a citizen of the People's Republic of China who resides in the State of California.  Wang agreed to become a limited partner in the Fund on or about October 20, 2009 and is presently a limited partner in the Fund.

38.     Li Wei Liu is a citizen of the People's Republic of China who currently resides at 730-4400 Hazelbridge Way, Richmond, British Columbia, Canada.  Li Wei Liu agreed to become a limited partner in the Fund on or about October 30, 2009 and is presently a limited partner in the Fund.

39.     Su Fang ("Fang") is a citizen of the People's Republic of China who currently resides at 1236 Sargent Drive, Sunnyvale, CA  94087.   Fang agreed to become a limited partner in the Fund on or about November 2, 2009 and is presently a limited partner in the Fund.

40.     Tianyi Liu is a citizen of the People's Republic of China who currently resides at 1600 South Eads Street #938N, Arlington, VA  22202.  Tianyi Liu agreed to become a limited partner in the Fund on or about January 6, 2010 and is presently a limited partner in the Fund.

41.     Xirui Chen is a citizen of the People's Republic of China. Xirui Chen agreed to become a limited partner in the Fund on or about January 11, 2010 and is presently a limited partner in the Fund.

42.     Ali Fuat Cercer and Faruk Cercer (collectively "the Cercers") are citizens of the Republic of Turkey who currently reside in Destin, FL.  The Cercers each agreed to become individual limited partners in the Fund on or about January 28, 2010 and are presently limited partners in the Fund.

43.     Suat Ocal and Suheyla Ocal (collectively "the Ocals") are citizens of the Republic of Turkey who currently reside in Destin, FL.  The Ocals each agreed to become individual limited partners in the Fund on or about January 28, 2010 and are presently limited partners in the Fund.

44.     Yiran Deng ("Deng") is a citizen of the People's Republic of China.  Deng agreed to become a limited partner in the Fund on or about March 18, 2010 and is presently a limited partner in the Fund.

45.     Rong Ma ("Ma") is a citizen of the People's Republic of China who currently resides in Nanjing.  Ma agreed to become a limited partner in the Fund on or about April 7, 2010 and is presently a limited partner in the Fund.

46.     Ming Chen ("Chen") is a citizen of the People's Republic of China. Chen agreed to become a limited partner in the Fund on or about April 14, 2010 and is presently a limited partner in the Fund.

47.     Reem Al Nasser ("Al Nasser") is a citizen and resident of the Kingdom of Saudi Arabia.  Al Nasser agreed to become a limited partner in the Fund on or about September 9, 2008 and is presently a limited partner in the Fund.

***Individual Defendants***

48.     Defendant William B. Hungerford, Jr. ("Hungerford") is, on information and belief, a citizen of Maryland.  At all times material to this action, Hungerford was a principal of Noble-RealEstate-GP, the general partner of the Fund.

49.     Defendant Timothy O. Milbrath ("Milbrath") is, on information and belief, a citizen of Maryland.  At all times material to this action, Milbrath was a principal of Noble-RealEstate-GP, the general partner of the Fund.

***NobleOutReach Entities – Louisiana Defendants***

50.     Defendant 3200 Burgundy Street, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of 3200 Burgundy Street, LLC is Defendant Eleanor Holdings, LLC, which is controlled by Defendants Hungerford and Milbrath.  3200 Burgundy Street, LLC was formed on May 21, 2010.

51.     Defendant Ballard Outreach, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 109 New Camellia Boulevard, Suite 200, Covington, Louisiana 70433.  Ballard Outreach, LLC was formed on February 11, 2011.

52.     Defendant Bartone, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of Bartone, LLC is Defendant Hungerford.  Bartone, LLC was formed on April 28, 2011.

53.     Defendant Bay-Algiers-JV, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General

DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of Bay-Algiers-JV, LLC is Defendant Hungerford.  Bay-Algiers-JV, LLC was formed on December 17, 2009.

54.    Defendant Bay-Bourbon-Ritas, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of Bay-Bourbon-Ritas, LLC is Defendant Hungerford.  Bay-Bourbon-Ritas, LLC was formed on October 22, 2009.

55.    Defendant Bay-Canal PJs, LLC a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of Bay-Canal PJS, LLC is Defendant Hungerford.  Bay-Canal PJS, LLC was formed on May 19, 2009.

56.    Defendant Bay-NOLA-Hospitality, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  Bay-NOLA-Hospitality, LLC was formed on February 15, 2011.  The managing officer of Bay-NOLA-Hospitality, LLC is Defendant Ballard Outreach, LLC.

57.    Defendant Bay-NOLA-Mgmt, LLC ("Bay-NOLA-Mgmt") is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  Bay-NOLA-Mgmt is a management company that is supposedly engaged in restaurant and hotel management through which it manages and pays for the expenses related to the NobleRealEstateFund, LP investments.   Defendants Hungerford and Milbrath are both

employees of, and receive salaries from, Bay-NOLA-Mgmt.  Bay-NOLA-Mgmt was originally formed on January 30, 2009 under the name "BayNola-Management, LLC."  On December 3, 2010, the entity's name was changed to Bay-NOLA-Mgmt, LLC.  The managing officer of Bay-NOLA-Mgmt is Defendant Hungerford.

58.     Defendant Bay-NOLA-Ventures-MD, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of Bay-NOLA-Ventures-MD, LLC is Defendant Hungerford.  Bay-NOLA-Ventures-MD, LLC was formed on February 19, 2010.

59.     Defendant Bay-One-Capital, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of Bay-One-Capital, LLC is Defendant Hungerford.  Bay-One-Capital, LLC was formed on May 19, 2009.

60.     Defendant Bay-PJs, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of Bay-PJS, LLC is Defendant Hungerford.  Bay-PJS, LLC was formed on May 19, 2009.

61.     Defendant Bay-Tulane PJs, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of Bay-Tulane PJS, LLC is Defendant Hungerford.  Bay-Tulane PJS, LLC was formed on December 17, 2009.

62.    Defendant Bay-Wow Franchise 2, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of Bay-Wow Franchise 2, LLC is Defendant Hungerford.   Bay-Wow Franchise 2, LLC was formed on October 22, 2009.

63.    Defendant Bay-Wow, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3421 N. Causeway Boulevard, Suite 301, Metairie, Louisiana 70002.  The managing officer of Bay-Wow, LLC is Defendant Hungerford.  Bay-Wow, LLC was formed on May 19, 2009.

64.    Defendant Bywater Holdings, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of Bywater Holdings, LLC is Defendant Hungerford.  Bywater Holdings, LLC was formed on May 21, 2010.

65.    Defendant Eleanor Holdings, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3200 Burgundy Street, New Orleans, Louisiana 70117.  The managing officer of Eleanor Holdings, LLC is Defendant Hungerford.  Eleanor Holdings, LLC was formed on January 27, 2010.

66.    Defendant Maurepas Foods, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3200 Burgundy Street, New Orleans, Louisiana 70117.  The managing officer of Maurepas Foods, LLC is Defendant Bywater Holdings, LLC.  Maurepas Foods, LLC was formed on May 18, 2011.

67.     Defendant Noble-Franchise 1&3, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3421 N. Causeway Boulevard, Suite 301, Metairie, Louisiana 70002.   The managing officer of Noble-Franchise 1&3, LLC is Defendant Hungerford.  Noble-Franchise 1&3, LLC, LLC was formed on September 12, 2008.

68.     Defendant Noble-Lodging-Partners, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.   The managing officer of Noble-Lodging-Partners, LLC is Defendant Hungerford.  Noble-Lodging-Partners, LLC was formed on December 17, 2008.

69.     Defendant Noble Lending Holdings, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.   The managing officer of Noble Lending Holdings, LLC is Defendant Hungerford.  Noble Lending Holdings, LLC was formed on August 4, 2010.

70.     Defendant NobleOutReach-NOLA, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.   The managing officer of NobleOutReach-NOLA, LLC is Defendant Hungerford.   NobleOutReach-NOLA, LLC was formed on June 9, 2006.

71.     Defendant NobleOutReach, Ltd., LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3421 N. Causeway Boulevard, Suite 301, Metairie, Louisiana 70002.   The managing officer of

14

NobleOutReach, Ltd., LLC is Defendant Hungerford.  NobleOutReach, Ltd., LLC was formed on January 30, 2009.

72.     Defendant Noble-Employees, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3421 N. Causeway Boulevard, Suite 301, Metairie, Louisiana 70002.  The managing officer of Noble-Employees, LLC is Defendant Hungerford.  Noble-Employees, LLC was formed on January 30, 2009.

73.     Defendant NobleReach-NOLA, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.   The managing officer of NobleReach-NOLA, LLC is Defendant Hungerford.  NobleReach-NOLA, LLC was formed on May 25, 2006.

74.     Defendant NOP, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3421 N. Causeway Boulevard, Suite 301, Metairie, Louisiana 70002.   The managing officer of NOP, LLC is Defendant Hungerford.  NOP, LLC was formed on March 22, 2007.

75.     Defendant Rita's Fajitas NOLA, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 417-419 Bourbon Street, New Orleans, LA 70130.   The managing officer of Rita's Fajitas NOLA, LLC is Defendant Bay-Bourbon-Ritas, LLC, which is managed by Defendant Hungerford.  Rita's Fajitas NOLA, LLC was formed on October 19, 2009.

76.     Defendant Rita's Tequila Bar Nola, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 417-419 Bourbon Street, New Orleans, LA 70130.   The managing officer of Rita's Tequila Bar Nola,

LLC is Defendant Rita's Fajitas NOLA, LLC, which is managed by Defendant Hungerford. Rita's Tequila Bar Nola, LLC was formed on November 12, 2009.

77.     Defendant Timone, LLC ("Timone") is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of Timone is Defendant Hungerford.  Defendants Hungerford and Milbrath ultimately own Timone through a series of shell limited liability companies, which are named Defendants in this action.  Timone was formed on September 12, 2008.

78.     Defendant VP Nola 2, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of VP Nola 2, LLC is Defendant Hungerford.  VP Nola 2, LLC was formed on December 16, 2008.

79.     Defendant VP Nola 2-WOW, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of VP Nola 2-WOW, LLC is Defendant Hungerford.  VP Nola 2-WOW, LLC was formed on January 18, 2010.

80.     Defendant VP Nola Land 2, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of VP Nola Land 2, LLC is Defendant Hungerford.  VP Nola Land 2, LLC was formed on December 16, 2008.

81.     Defendant VP Nola, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.  The managing officer of VP Nola, LLC is Defendant Hungerford.  VP Nola, LLC was formed on December 16, 2008.

82.     Defendant NobleOutReach Original Principals, LLC is a limited liability company organized and existing under the laws of Louisiana and has a principal place of business at 3421 N. Causeway Boulevard, Suite 301, Metairie, Louisiana 70002.  Defendants Hungerford and Milbrath each own a fifty (50%) percent interest in NobleOutReach Original Principals, LLC and Defendant Hungerford is the managing officer of NobleOutReach Original Principals, LLC.  NobleOutReach Original Principals, LLC was formed on January 30, 2009.

### *NobleOutReach Entities – Maryland Defendants*

83.     Defendant NobleOutReach, LLC ("NobleOutReach") is a limited liability company organized and existing under the laws of Maryland and has a principal place of business at 20203 Goshen Road, Suite 302, Gaithersburg, Maryland 20879.  NobleOutReach also maintains an office in Louisiana at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.   NobleOutReach is owned and controlled by Defendants Hungerford and Milbrath.  NobleOutReach was formed on May 5, 2006.

84.     Defendant Bay-NOLA Ventures MD, LLC is a limited liability company organized and existing under the laws of Maryland and has a principal place of business at 20203 Goshen Road, Suite 302, Gaithersburg, Maryland 20879.  The company's registered mailing address, however, is 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114. Bay-NOLA Ventures MD, LLC is owned and controlled by Defendants Hungerford and Milbrath.  Bay-NOLA Ventures MD, LLC was formed on February 23, 2010.

17

### *NobleOutReach Entities – Delaware Defendants*

85.    Defendant Noble-RealEstate-GP, LLC ("Noble-RealEstate-GP") is a limited liability company organized and existing under the laws of Delaware and has a principal place of business at 3421 N. Causeway Boulevard, Suite 301, New Orleans, Louisiana 70002.   The designated registered agent of Noble-RealEstate-GP is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  Noble-RealEstate-GP is the general partner of the Fund and owns a twenty (20%) percent interest in the Fund.   Defendants Hungerford and Milbrath are the managing members of Noble-RealEstate-GP.   Noble-RealEstate-GP was formed on June 7, 2007.

86.    Defendant Noble-RE-Management, LLC ("NRE-Management") is a limited liability company organized and existing under the laws of Delaware.  The designated registered agent of Noble-RE-Management is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  NRE-Management is ultimately owned and controlled by Defendants Hungerford and Milbrath.  Noble-RE-Management, LLC was formed on June 7, 2007.

### *Nominal Defendant*

87.    Nominal defendant NobleRealEstateFund, L.P. (referred to as the "Fund"), is a limited partnership organized and existing under the laws of Delaware and has a principal place of business at 3421 N. Causeway Boulevard, Suite 301, New Orleans, Louisiana 70002.  The Fund is listed as a nominal defendant for purposes of asserting the derivative claims against the other defendants on behalf of the Fund.

## JURISDICTION AND VENUE

88.    The amount in controversy exceeds $75,000.

89.     Thus, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship between the parties.

90.     This Court has jurisdiction over each Defendant named herein because each Defendant is either: (a) an individual or a limited liability company that has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice; or (b) a limited liability company or a limited partnership that conducts business in and maintains operations in this district.

91.     Venue is proper in this Court because one or more of the Defendants reside in or maintains a principal place of business in this District; a substantial portion of the transactions and wrongs complained of herein were committed and/or occurred in this District; and Defendants have received substantial compensation and improper benefits in this District by doing business here and engaging in numerous activities that had (and continue to have) an effect in this District.

## STATEMENT OF FACTS

### *The EB-5 Immigrant Investor Visa Program*

92.     In 1990, the U.S. government created the employment-based fifth preference immigrant visa category ("EB-5 Visa Program") for immigrant investors.

93.     This visa provides a method for obtaining lawful U.S. permanent residency for foreign nationals (and their immediate family members) who invest money in the United States.

94.     To obtain the visa, individuals must invest $1,000,000 in commercial enterprises in the United States, creating or preserving within two (2) years at least ten (10) full time jobs for U.S. workers, excluding the investor and their immediate family members.

95.     The $1 million investment is reduced to $500,000 if the investment is made in a high unemployment or rural area.

96.     If the foreign national investor's petition is approved, the investor and their dependents will usually be granted conditional permanent residence in the U.S., which residence is valid for two years.

97.     Within the 90-day period before the conditional permanent residence expires, the investor must submit evidence to USCIS documenting that the full required investment has been made and maintained and that at least ten (10) full-time jobs for U.S. workers have been created (or maintained) or will be created within a reasonable time period.

98.     In 1992, the U.S. Congress created a temporary pilot program under the EB-5 Visa Program allowing immigrant investor funds to be pooled together for investment in larger commercial enterprises designed to stimulate economic activity and job growth, while still allowing eligible foreign nationals the opportunity to become lawful permanent residents (the "EB-5 Immigrant Investor Pilot Program").

99.     USCIS is the agency within the U.S. government that is responsible for issuing regulations regarding the EB-5 Immigrant Investor Pilot Program and for approving the entities allowed to accept pooled investments, *i.e.*, "Regional Centers."

100.    Under this pilot program, foreign nationals may invest in a pre-approved "Regional Center," which is defined as an "economic unit, public or private, which is involved with the promotion of economic growth, including increased export sales, improved regional productivity, job creation, or increased domestic capital investment."

101.    The EB-5 Immigrant Investor Pilot Program authorizes cities, states and other entities to apply to USCIS for certification as a "Regional Center," which then allows the entity

to affiliate with or create "new commercial enterprises."  These enterprises can accept investments from foreign nationals under the EB-5 Visa Program, and the immigrant investor may then count the indirect job creation along with direct job creation toward the 10-job creation requirement when they apply for U.S. lawful residency based on his or her investment in the enterprises of the Regional Center.

102.   Immigrant investors initially receive two-year residencies, during which time the Regional Center, through its investment in one or more commercial enterprises, is required to invest and maintain the immigrant investor's full capital contribution in a job creating entity that creates at least ten (10) full time jobs for U.S. workers based on the immigrant investor's capital contribution.

103.   A Regional Center is explicitly prohibited by regulation and/or policy from using any part of an immigrant investor's capital contribution to pay for or fund activities outside the actual creation and operation of the job-creating commercial enterprise.

104.   After an immigrant investor passes all checks by USCIS and the immigrant investor demonstrates to USCIS that his or her full capital contribution was used and/or invested into a job-creating entity and that the entity produced at least ten (10) full time jobs for U.S. workers based on this investment, the investor (and his or her immediate family) is usually granted unconditional U.S. lawful permanent residency.

### *The City of New Orleans Regional Center*

105.   On January 18, 1994, the Mayor's Economic Development Department of the City of New Orleans was initially approved and designated as a Regional Center to participate in the Immigrant Investor Pilot Program by the predecessor federal agency to USCIS.

106.    In May 2006, during the administration of former New Orleans Mayor C. Ray Nagin, the Mayor's Office of Economic Development ("MOED") of the City of New Orleans advised USCIS of a restructuring and reorganization of the former Mayor's Economic Development Department into MOED.

107.    In an electronic Request for Evidence dated June 14, 2006 and directed to the MOED, USCIS identified fourteen (14) factors that the MOED would need to address in any amendment to its original Regional Center approval and designation.

108.    On October 16, 2006, the MOED submitted a comprehensive response to the USCIS electronic Request for Evidence together with supporting evidence, data, and information.

109.    In its response, the MOED sought to re-certify its designated Regional Center by substantively amending its business plan, in part, to have defendant NobleReach-NOLA, LLC ("NobleReach-NOLA") operate and administer funds related to the MOED Regional Center.

110.    In furtherance of the proposed arrangement with the Nagin-era MOED, Hungerford and Milbrath registered or caused to be registered NobleReach-NOLA on or about May 25, 2006 as a limited liability company organized and existing under the laws of Louisiana.

111.    At all times material to this action, Hungerford and Milbrath operated, controlled, and ultimately owned (and continue to own) NobleReach-NOLA through two different limited liability companies: NOP, LLC and NobleOutReach Original Principals, LLC, which together are the sole members of NobleReach-NOLA.

112.    Hungerford and Milbrath registered or caused to be registered NobleOutReach Original Principals, LLC as a limited liability company organized existing under the laws of Louisiana, and is wholly owned by Hungerford and Milbrath.

113.    Hungerford and Milbrath likewise registered or caused to be registered NOP as a limited liability company organized and existing under the laws of Louisiana, and is wholly owned by NobleOutReach Original Principals, LLC, which (as just described) is wholly owned by Hungerford and Milbrath.

114.    Upon information and belief, Hungerford and Milbrath formed NobleReach-NOLA and the entities through which Hungerford and Milbrath own, operate, and control NobleReach-NOLA for the sole purpose of creating a vehicle through which to perpetrate fraudulent schemes to divert Fund assets and convert such assets for their own ultimate persona benefit.

115.    Upon information and belief, NobleReach-NOLA has no legitimate and/or independent business activities outside of its involvement in the fraudulent schemes of Hungerford and Milbrath to divert Fund assets.

116.    Upon information and belief, NOP is a sham company formed by Hungerford and Milbrath solely for the purpose of serving as a vehicle to convert money from the Fund and funnel it to Hungerford and Milbrath for their own ultimate personal benefit.

117.    Upon information and belief, NobleOutReach Original Partners LLC is a sham company formed by Hungerford and Milbrath solely for the purpose of serving as a vehicle to convert money from the Fund and funnel it to Hungerford and Milbrath for their own ultimate personal benefit.

118.    As part of its approval process, USCIS reviewed a Memorandum of Understanding between NobleReach-NOLA, LLC and the MOED outlining various facets of NobleReach-NOLA's responsibilities, undertakings, and representations with respect to its

proposed role with respect to the MOED Regional Center.  A true and correct copy of the Memorandum of Understanding is attached hereto as **Exhibit "A"**.

119.    By letter dated February 16, 2007, USCIS notified the City of New Orleans Office of Planning and Development and Defendant NobleReach-NOLA (through its President and Managing Member, Defendant Hungerford) that USCIS was approving the MOED's contractual arrangement with NobleReach-NOLA to operate the MOED Regional Center, together with amendments to the designation, business plan and job creation multipliers for the MOED Regional Center.

120.    USCIS's approval was based on evidence, data, and information that Hungerford and Milbrath prepared or caused to be prepared and submitted to USCIS and/or the MOED, including representations included in the Memorandum of Understanding regarding NobleReach-NOLA's agreement with the Nagin administration to run the MOED Regional Center.

### *Organization of the NobleRealEstate Fund, LP*

121.    At the same time the Nagin administration approached USCIS about "restructuring" the Regional Center to put defendants Hungerford and Milbrath in charge through NobleReach-NOLA, Hungerford and Milbrath undertook to form yet another company called NobleOutReach, LLC ("NobleOutReach"), which Hungerford and Milbrath registered or caused to be registered in May, 2006 as a limited liability company organized and existing under the laws of Maryland.

122.    NobleOutReach is a limited liability company organized and existing under the laws of Maryland but maintains an office in Louisiana at 3520 General DeGaulle Drive, Suite 3110, New Orleans, Louisiana 70114.   Upon information and belief, NobleOutReach is

ultimately owned and controlled by Hungerford and Milbrath through NobleOutReach Original Partners, LLC.

123.   Hungerford and Milbrath held and continue to hold NobleOutReach out as a company that helps foreign nationals and immigrant investors invest in the United States economy through for-profit investment venture funds that also provide EB-5 visas and, ultimately, permanent residency status in the United States through investments that create jobs for U.S. workers.   A true and correct copy of the NOR "Investing in America" marketing materials that were provided to Plaintiffs is attached hereto as **Exhibit "B"**.

124.   Hungerford and Milbrath each represented to Plaintiffs that NobleOutReach was working to invest private equity capital in New Orleans to launch profitable businesses, rebuild troubled businesses, and aid in job creation for New Orleans.

125.   Towards that end, Hungerford and Milbrath, acting individually and through NobleOutReach, formed the Fund or caused it to be formed and held the Fund open to potential immigrant investors as avowed investment fund.

126.   At all times material to this action, Hungerford and Milbrath created, operated, and controlled the Fund (and still do so to this day) through the Fund's general partner, Noble-RealEstate-GP.

127.   Hungerford and Milbrath ultimately own Noble-RealEstate-GP through NOP and NobleOuteach Original Principals, LLC − the same sham companies through which Hungerford and Milbrath own and control NobleReach-NOLA.

128.   At all times material to this action, Noble-RealEstate-GP was and still is a company that Hungerford and Milbrath control, operate, and ultimately own.

### *The Private Placement Memorandum for the Fund*

129.  In May 2007, NobleOutReach issued a confidential private placement memorandum ("PPM") in connection with a private placement of $50,000,000 of limited partnership interests in the Fund.  The PPM was last updated in December 2007 (the PPM, as updated, is hereinafter referred to as the "PPMs").  A true and correct copy of the December 2007 PPM is attached hereto as **Exhibit "C"**.

130.  According to the PPMs, the Fund was formed to invest in a portfolio of specific business ventures in the Eastern District of Louisiana with the objectives of (i) creating financial returns for investors, (ii) assisting certain foreign investors with meeting the requirements of the employment based fifth preference immigrant visa category ("EB-5") immigrant investor petition requirements and (iii) contributing to the reconstruction and rejuvenation of New Orleans and the surrounding coastal areas that were devastated by Hurricanes Katrina and Rita.

131.  The PPMs set forth that the Fund, through an affiliate, had secured a 30-year contract with the City of New Orleans to manage the MOED Regional Center.

132.  The "affiliate" referenced in the PPMs is defendant NobleReach-NOLA, which (as previously described) is ultimately owned, operated, and controlled by defendants Hungerford and Milbrath.

133.  The PPMs touted the immigration benefits for immigrant investors, noting that immigrant investors who invest in Regional Centers may include both direct and indirect growth in calculating job creation for purposes of meeting the EB-5 visa requirements.

134.  The PPMs further explained that the general partner of the Fund, Noble-RealEstate-GP, believed that focusing the Fund's investments in the New Orleans and

surrounding areas would provide opportunities for profitable reconstruction efforts, financial returns, immigration benefits, and job creation benefits for the investors.

135.    The PPMs also set forth specific representations regarding the structure, management, capital contributions and fees that limited partners would be subjected to for participating in the Fund.

136.    The PPMs specifically included a provision regarding "conflicts of interest" that should have disclosed the personal interests of Hungerford and Milbrath in any investments pursued by the Fund.

137.    Significantly, the PPM did not disclose that the Fund would be making investments in a web of multiple limited liability companies formed, controlled, and ultimately owned by Hungerford and Milbrath, notwithstanding that the financial investments in these limited liability companies would be funded almost entirely from Plaintiffs' investments in the Fund.

138.    The PPMs stated that Defendant Noble-RE-Management, LLC (yet another company formed and ultimately controlled by Hungerford and Milbrath) would "administer and manage the reporting, tracking, and other management duties associated with the EB-5 immigration program requirements."

139.    The PPMs stated that the general partner would contribute capital to the Fund in cash or by interest bearing promissory note equal to 0.5% of the capital contributed by all partners to the Fund.

140.    The PPMs stated that immigrant investors would be charged a one-time, up-front service fee equal to 12% of the immigrant investors' capital commitment, *i.e.*, $60,000, which

fee would be paid to Noble-RE-Management, the designated "Management Company" for the Fund, which was also owned, operated and controlled by Hungerford and Milbrath.

141.   The PPMs provided that the service fee would be used to fund services provided to the EB-5 immigrant investors such as tracking job creation, status reporting to the USCIS and the City of New Orleans regarding the investors and the investments, and travel expense and presentation expenses to discuss the EB-5 Visa Program and the Fund.

142.   The PPMs further provided that Defendant Noble-RealEstate-GP, in its capacity as the general partner for the Fund, would also be paid a "management" fee equal to 2.5% annually of the greater of: (a) aggregate capital commitments of the Fund during the investment period or (b) the total value of assets under ownership and management by the Fund.

143.   Defendant Noble-RealEstate-GP was required to pay all day-to-day activities and routine expenses of the Fund, including salaries, wages, rent, travel, and expenses incurred in the investigation of investment opportunities from the "service" fee and the "management" fee, and *not* from the $500,000 capital contribution of each immigrant investor.

144.   The Fund was also responsible for the payment of its own legal, tax, management costs and expenses, administrative fees and costs, audit fees and costs, fees and expenses to recruit investors, and accounting expenses.

145.   The PPMs expressly advised potential immigrant investors that the Fund planned to invest in enterprises within the following industries: (a) medical and healthcare delivery industry; (b) lodging and hospitality industry; (c) mixed use real estate industry; (d) arts and sciences industry; (e) harbor industry; (f) gaming industry; and (h) marine industry.

146.    The PPMs also included detailed representations regarding the Fund's investment and due diligence process in screening and commitment to potential business venture investments.

147.    This "investment process" included, *inter alia*, for any prospective investment a review of the specific business plan involved and an analysis of the business plan.

148.    If the decision was made to pursue a prospective investment further, the PPMs provided that the Fund's management team (*i.e.*, Hungerford and Milbrath) would conduct a due diligence review of the prospective investment, including a detailed analysis of a company's market, competition, competitive strategy, management, backgrounds, technology, products, job creation potential and capital requirements.

149.    At all times material to this action, upon information and belief, Hungerford and Milbrath, through Noble-RealEstate-GP, made all investment decisions on behalf of the Fund.

150.    The PPMs required the general partner of the Fund (Noble-RealEstate-GP) to monitor investments including an investment opportunity's progress against milestones and execution of that venture's corporate strategy.

### *The NobleRealEstateFund Limited Partnership Agreement*

151.    According to the terms of the Fund's Limited Partnership Agreement (the "LP Agreement"), all capital contributions of the limited partners were to be deposited into an investment escrow account.   A true and correct copy of the NobleRealEstateFund Limited Partnership Agreement is attached hereto as **Exhibit "D"**.  [Exhibit "D" at ¶ 4.2(a)].

152.    Pursuant to the LP Agreement, Noble-RealEstate-GP was required to contribute operating capital to the Fund equal to 0.5% of the total capital contributions of all partners. [Exhibit "D" at ¶ 4.3].

153.    In addition, the LP Agreement provided that Noble-RealEstate-GP would be paid a management fee on a quarterly basis in an amount equal to the greater of: (a) the aggregate capital commitments of all partners as of the first day of each quarter multiplied by 0.625%; or (b) the total value of all assets under ownership and management by the Partnership multiplied by 0.625%.  [Exhibit "D" at ¶ 6.1].  This quarterly fee corresponded to the annual 2.5% management fee for Noble-RealEstate-GP as described in the PPMs.

154.    The LP Agreement also set forth the responsibility of the general partner – Noble-RealEstate-GP –  for certain expenses, including all normal operating expenses such as salaries, wages, travel, overhead and rentals payable for space used by the general partner, and in managing investments of the Fund.  [Exhibit "D" at ¶ 6.2(a)].

155.    The Fund was also responsible for certain expenses incurred in connection with its investments.  [Exhibit "D" at ¶¶ 6.2(b) and (c)].

156.    Furthermore, the Fund and the general partner, Noble-RealEstate-GP, each agreed to reimburse the other as appropriate in the event that either such party pays an obligation that is properly the responsibility of the other.

157.    The LP Agreement also referenced the service fee that each immigrant investor was required to pay in addition to their $500,000 investment as a one-time, up-front fee as equal to 12% of the immigrant investor's capital contribution, *i.e.*, $60,000.  [Exhibit "D" at ¶ 6.3].

158.    The LP Agreement required the service fees to be deposited into an escrow account and the monies deposited were to be used by Noble-RealEstate-GP as compensation for services rendered in connection with assistance in the EB-5 immigrant visa application process and compliance and tracking and reporting of, and allocation of jobs created.  [Exhibit "D" at ¶ 6.3].

159.   The LP Agreement further provided that Noble-RealEstate-GP, in its capacity as the general partner, was responsible for the overall management of the Fund and its duties and responsibilities under the LP Agreement and governing law.  [Exhibit "D" at ¶ 8.1(a)].

160.   Noble-RealEstate-GP owes the Fund and its limited partners fiduciary duties, including the duty of care and duty of loyalty.  [Exhibit "D" at ¶ 8.1(b)].

161.   The LP Agreement provides that Noble-RealEstate-GP will have violated its duty of care to the Fund and its limited partners if its conduct constitutes fraud, willful misconduct or gross negligence.  [Exhibit "D" at ¶ 8.1(b)].

### *The Plaintiffs' Immigration Status*

162.   The process of obtaining permanent resident status through the EB-5 Immigrant Investor Pilot Program involves three steps.

163.   First, a form I-526, "Immigrant Petition by Alien Entrepreneur" (the "I-526 Petition") must be filed with USCIS.

164.   Hungerford and Milbrath provided each Plaintiff with all of the supporting documents and information regarding the Fund's investments in businesses and/or commercial enterprises to meet USCIS's documentation requirements for the I-526 Petitions.

165.   If an immigrant investor's I-526 Petition is approved, an immigrant visa application or an application for adjustment of status through the USCIS must be submitted.

166.   After review and approval of all required documents that need to be submitted, the immigrant investor may be issued an immigrant visa which will permit him or her to be admitted as a "Conditional Resident" (*i.e.*, Green Card holder), or if eligible for adjustment of status, the immigrant investor may be granted Conditional Resident status without leaving the United States.

167.    The immigrant investor's Conditional Resident status will then continue for a period of two years.

168.    The final step in the immigration process is filing Form I-829, a "Petition by Entrepreneur to Remove Conditions" (the "I-829 Petition") within 90 days before the end of the two-year conditional residence period.

169.    All of the evidence needed to demonstrate to USCIS that the individual Plaintiffs fulfilled the requirement of investing in a business that created ten (10) U.S. jobs was prepared by, or at the direction of, Hungerford and Milbrath.

170.    During the time period 2008 through the present, Hungerford and Milbrath individually and through multiple limited liability companies that they formed during the period 2008 through 2010, made numerous representations to Plaintiffs, USCIS, and the City of New Orleans relevant to the foregoing process and steps, including:

a.    that the Fund would invest in the following projects: Swiftships Shipbuilders, LLC; New Orleans Value Place Investments; First NBC Bank; Equipco, LLC; New Orleans Diplomat; and The Film Factory;

b.    that the Regional Center had been approved for investment in "Financial Consulting, Real Estate Consulting and Leasing, and other Consulting";

c.    that all investor capital would be invested in job-creating enterprises and not used to pay the Fund's operational expenses;

d.    that all of the enterprises would be based and operated in the City of New Orleans;

e.    that the investors, as limited partners in the Fund, would share pro rata in the financial returns of the Fund's investments;

f.      that there are only two (2) companies (Noble-RealEstate-GP and Noble-RE-Management) affiliated with the Fund;

g.      that the Regional Center would regularly disclose and report to USCIS and the Fund's investors the status of job-creating projects;

h.      that Hungerford and Milbrath had created a "very straight-forward investment vehicle"; and

i.      that there would not be capital calls or requirements for extra funds, *i.e.*, the Plaintiffs' $500,000 investment and one-time $60,000 service fee were sufficient to complete the Fund's proposed projects.

171.    Ten of the named Plaintiffs have submitted I-829 Petitions with USCIS seeking approval of their permanent residency status in the U.S.

172.    To date, none of the I-829 Petitions submitted in association with the Fund have been approved.

173.    The earliest I-829 Petition was submitted in or around May 2010 on behalf of Plaintiff Terrence Sumpter.

174.    Plaintiffs rely on Hungerford and Milbrath to provide the substantive information required to demonstrate that Plaintiffs' investments have generated ten (10) U.S. jobs, which information is the most critical component of the I-829 Petition.

175.    The substantive information purporting to demonstrate that Plaintiff Sumpter's $500,000 investment created ten (10) U.S. jobs was prepared by, or under the direction of, Hungerford and Milbrath.

176.    For Plaintiff Sumpter, Hungerford and Milbrath relied upon the Fund's Value Place hotel project for purpose of meeting the ten (10) job requirement.

177.    USCIS sent Plaintiff Sumpter a request for evidence (the "Sumpter RFE") following review of his I-829 Petition in or around May 2011.

178.    In the Sumpter RFE, USCIS requested additional information regarding the status of construction of the Fund's Value Place hotel project in order to verify that the job-creation requirement was met.

179.    Hungerford and Milbrath prepared information on behalf of Plaintiff Sumpter to address the concerns raised by USCIS in the Sumpter RFE.

180.    USCIS has yet to respond to the additional information prepared by Hungerford and Milbrath.

181.    The ability of all Plaintiffs to complete the foregoing process and receive permanent residency in the United States is now in serious jeopardy as a result of the gross mismanagement and conversion of Fund assets by defendants Hungerford and Milbrath.

182.    Specifically, if an immigrant investor does not file his or her I-829 Petition before the 2-year conditional residency period expires, the immigrant investor's conditional residency is automatically terminated and the individual is barred from seeking permanent residency under the EB-5 Immigrant Investor Visa Program.

183.    Seventeen (17) of the named Plaintiffs still need to file their I-829 Petitions.

184.    For example, the following identified Plaintiffs, among others, must submit their I-829 Petitions on or before the corresponding date or they will face deportation proceedings: (1) Tianyi Liu – I-829 Petition due on or before June 17, 2012; (2) Shuangmei Ge – I-829 Petition due on or before August 5, 2012; (3) Wenjie Zhan – I-829 Petition due on or before September 29, 2012; and (4) Xiao Tong Zhang – I-829 Petition due on or before November 2012.

185.   In order to complete and submit their I-829 Petitions in a timely fashion, Plaintiffs will require, among other things, access to information currently in the defendants' possession.

186.   Unless Plaintiffs are granted access to information in defendants' possession and control, it is likely that Plaintiffs will not be able to complete their I-829 Petitions and/or USCIS will ultimately reject such petitions.

187.   If USCIS denies any of Plaintiffs' I-829 Petitions, such Plaintiffs will become deportable, and thus forced to return to their country of origin.

188.   Alternatively, such Plaintiffs will have the option of investing an additional $500,000 or $1,000,000 (depending on area of investment enterprise) in a different investment enterprise and filing a new I-526 petition and re-immigrating.

189.   Significantly, any children who turned 21 after their parents' original I-526 Petition filings would not be able to avail themselves of the option of re-immigrating based on their parents' new investment.

### *NobleRealEstateFund Projects*

190.   Between 2008 and the end of 2010, Defendants Hungerford and Milbrath devised a scheme in which they diverted all or substantially all of the Plaintiffs' investments to purported enterprises ultimately owned and controlled by Hungerford and Milbrath through a complex organizational structure involving over thirty (30) limited liability companies from within and outside Louisiana.

191.   Specifically, Defendants Hungerford and Milbrath directed that limited liability companies be set-up for each project, over which they layered still other companies (often twice over) to conceal their personal ownership interests and control.

192.     The web of companies created by Hungerford and Milbrath was devised such that the Fund (and ultimately, the Plaintiffs) contributed all or nearly all of the financing for various enterprises and projects that Defendants Hungerford and Milbrath received the majority of ownership interests with virtually no capital contributions to the new entities.  A chart depicting the complex organizational structure of the Fund's investments is attached hereto as **Exhibit "E"**.

193.     Hungerford and Milbrath never disclosed to Plaintiffs that the Fund's investments would be structured in such a complicated and non-transparent manner.

194.     The PPMs were never updated to disclose to Plaintiffs that the Fund's investments would be structured in such a complicated and non-transparent manner.

195.     NobleRealEstateFund monies have allegedly been used to invest in the following entities and projects: (a) Defendant Bay-NOLA-Mgmt, LLC; (b) Defendant Bay-NOLA-Hospitality, LLC; (c) Value Place Hotel, WOW Restaurant & Conference Center; (d) PJ's Coffee Shop – Tulane University; (e) PJ's Coffee Shop – Canal Street; (f) Rita's Fajitas & Tequila Bar; (g) Maurepas Food; (h) WOW Café and Wingery Franchise Holding Companies; and (i) Noble-Franchise 1&3, LLC.

196.     Although the Fund, through the Plaintiffs' individual $500,000 investments, provided all or nearly all of the capital for the foregoing entities and projects, the Fund retained a relatively small ownership interest in the foregoing entities and projects.

197.     Hungerford and Milbrath who contributed little or no money for the capital needs of the foregoing entities or projects acquired majority ownership interests in the foregoing entities and projects through the web of companies that they formed.

198.    Hungerford and Milbrath purposefully and knowingly concealed and suppressed the truth about their ultimate ownership interests in and control of the companies and projects to which they caused the Fund to direct Plaintiffs' investments in order to mislead Plaintiffs as to the disposition of those funds and to conceal these Defendants' scheme.

### *Hungerford and Milbrath Attempt to Conceal their Conversion of Fund Assets*

199.    During the period 2009 through the end of 2011, Plaintiffs periodically requested information from Hungerford and Milbrath regarding the Fund's investments and the status of the projects that were meant to create the U.S. jobs to meet the EB-5 Visa requirements.

200.    These requests included financial statements for the Fund and the projects that would show gross and net profits for the various projects.

201.    In addition to failing to provide accurate, non-misleading financial statements and other information that would have demonstrated that they were, in fact, converting the Fund's money for their ultimate personal benefit, Hungerford and Milbrath otherwise intentionally misled Plaintiffs regarding the profitability and viability of the Fund's projects.

202.    For example, on December 30, 2009, Hungerford responded by e-mail to a series of questions raised by Plaintiff Faruk Cercer on behalf of himself and Plaintiffs Ali Fuat Cercer, Suat Ocal and Suheyla Ocal.  A true and correct copy of the December 30, 2009 e-mail is attached hereto as **Exhibit "F"**.

203.    In the December 30, 2009, e-mail, Hungerford makes several affirmative misrepresentations including, but not limited to, the following:

        a.    "I can say the Fund targets investments that produce jobs, are for-profit entities, and provide a target profit of 18%-26% per year.  We have projects that are in the Fund's portfolio which have a profit percentage of 36%."

b.     There are "many" foreign investors currently invested in the Fund and "[t]here have been sufficiently large enough numbers of investors to provide sufficient capital to invest in coffee shops, restaurants, hotels, land, conference center, and office building.  We have already invested into these many New Orleans businesses, and they are producing jobs and financial returns."

c.     "We run a very successful EB-5 Regional Center.  We have been fortunate and blessed and have had 100% success rate for both those eligible to immigrate to the US and 100% success rate for those have received approvals through our Regional Center."

d.     "We expect many more [projects] during 2010 – the future projects include 5 new hotels, 4 restaurants, a potential film studio, and many more."

e.     The fund has a Board – the Fund Advisory Board (FAB).  It is comprised of attorneys, accountants, international experts, tax people, real estate people, and others – these people provide expert input as the FAB and allow us to make successful decisions on fund allocations, fund capital requirements, perform project vetting, perform due diligence, fund investments, and insight into all of the fund's portfolio investment companies."

204.   In addition, when Hungerford and Milbrath finally began to provide financial information regarding the Fund and its investments, the information was incomplete.

205.   In or around June 2011, USCIS confirmed that it would only recognize two of the various investments by the Fund − those pertaining to the Value Place Hotel and WOW Restaurant projects (discussed further herein below) − for purposes of the job creation requirements of the EB-5 Immigrant Investor Pilot Program.  The other projects in which the Fund invested were not so recognized by USCIS.

206.    Hungerford and Milbrath concealed and suppressed and/or caused the concealment and suppression of this information for several months from Plaintiffs.

207.    In or around November 2011, Plaintiffs discovered on their own, despite efforts by Hungerford and Milbrath to conceal and suppress the truth, that the Value Place Hotel and WOW Restaurant projects could not move forward with construction due to a lack of capital on the part of the Fund.  The Fund has no provision for capital calls within any of its PPMs.

208.    Specifically, in November 2011, Plaintiff Shuangmei Ge sent her agent, Tong Wu ("Wu"), to New Orleans to monitor the status of the Fund's various investments in New Orleans.

209.    Plaintiff Ge was concerned regarding her investment in the Fund, because Hungerford and Milbrath had failed to provide information regarding the projects despite repeated requests through an intermediary.

210.    Upon learning that Plaintiff Ge's agent was traveling to New Orleans to tour the status of the Fund's various projects, Hungerford traveled from Maryland to meet Wu there.

211.    Upon meeting Hungerford in New Orleans, Hungerford told Wu that the money invested in the Fund had already been spent on the Value Place hotel project and that it was only half-complete.

212.    This statement was false because the money invested in the Fund was not spent on legitimate projects by Noble-RealEstate-GP, which was and still is operated and controlled by Hungerford and Milbrath.

213.    To the contrary, the money invested in the Fund had been obtained by Hungerford and Milbrath by false pretenses and fraud for their ultimate personal benefit.

214.   At this meeting in or around November 2011, Hungerford also told Wu for the first time that if there were further delays with the Value Place hotel project, USCIS would not approve Plaintiff Ge's application for permanent residency within the United States.

215.   When pressed for an explanation as to where all of the Fund's money had gone, Hungerford made another false statement by telling Wu that the money was invested into five cafes, two restaurants, land for the hotel and some other preliminary investments.

216.   This statement was false because Hungerford and Milbrath had, in fact, converted at least $6 million of the Fund's assets by this time for their ultimate personal benefit.

217.   The failure of the Value Place Hotel and WOW Restaurant projects to move forward places Plaintiffs' residency status in jeopardy since they are the only projects USCIS will consider for purposes of meeting the 10-job creation requirement under the EB-5 Immigrant Investor Pilot Program, a requirement for each Plaintiff to obtain unconditional U.S. lawful permanent residency.

218.   To date, the Fund has, upon information and belief, less than $100,000 in cash assets left from the $15.5 million investment money.

219.   The Fund has never turned a profit from any of its various investments for its investors and, as further described herein, cannot do so given the past, present, and on-going mismanagement, fraud, and misappropriations perpetrated against the plaintiff immigrant investors by Hungerford and Milbrath.

220.   None of the Plaintiffs and, upon information and belief, no other investor in the Fund has as yet successfully obtained permanent residency through the EB-5 program.

## GROSS MISMANAGEMENT, MISAPPROPRIATION, & CONVERSION OF FUND ASSETS

### *$6 Million Payment from NobleRealEstate Fund to Bay-NOLA-Mgmt and other Related Transactions involving Bay-NOLA-Mgmt*

221.    Hungerford and Milbrath registered or caused to be registered Bay-NOLA-Mgmt on January 30, 2009, as a limited liability company organized and existing under the laws of Louisiana.

222.    Bay-NOLA-Mgmt is supposedly a construction company, food service and restaurant operator, and a master controlling firm handling business operations and management, financial, economic and business projects and construction analysis.

223.    Hungerford and Milbrath have employed themselves as the principals of Bay-NOLA-Mgmt, are employees of Bay-NOLA-Mgmt, and are paid salaries from this entity.

224.    In reality, Bay-NOLA-Mgmt is a sham company formed by Hungerford and Milbrath solely for the purposes of serving as a vehicle to steal money from the Fund.  On information and belief, neither Hungerford nor Milbrath have any experience in the hospitality industry.

225.    Upon information and belief, Bay-NOLA-Mgmt has no other clients, aside from the various Noble-related entities formed by Hungerford and Milbrath.

226.    Bay-NOLA-Mgmt has a principal place of business at 3520 General De Gaulle Drive, Suite 3110, New Orleans, Louisiana 70114, which is the same listed principal place of business as twenty-six (26) additional limited liability companies formed by Hungerford and Milbrath as part of the web of companies set-up in furtherance of their scheme.

227.    Bay-NOLA-Mgmt is comprised of two members: the Fund and Defendant Timone, LLC ("Timone").

228.    Hungerford and Milbrath caused the Fund to pay $6,000,300 for a 49% interest in

41

Bay-NOLA-Mgmt.

229.   Timone paid $200 for its controlling fifty-one (51%) percent interest in Bay-NOLA-Mgmt.

230.   Hungerford and Milbrath registered or caused to be registered Timone on September 12, 2008 as a limited liability company organized and existing under the laws of Louisiana.

231.   Upon information and belief, Timone is a sham company formed by Hungerford and Milbrath solely for the purpose of serving as a vehicle to facilitate their scheme to convert Fund assets for their own ultimate benefit.

232.   Timone shares the same listed principal place of business as Bay-NOLA-Mgmt.

233.   Timone is one hundred (100%) percent owned by NOP, which (as previously described) is wholly owned and controlled by Hungerford and Milbrath.

234.   The Fund's forty-nine (49%) percent interest in Bay-NOLA-Mgmt is worthless because Bay-NOLA-Mgmt is a sham company with no legitimate business purpose, business operations, or assets.

235.   Upon information and belief, among Bay-NOLA-Mgmt's only ongoing "operations" is providing management services and paying expenses related to the Fund's investments.

236.   It is unclear why such a management company is necessary, given that the Fund already pays Noble-RealEstate-GP a management fee for presumably the same services.

237.   Significantly, Bay-NOLA-Mgmt paid $1.82 million in payroll/salary to the employees of NobleOutReach, including (without limitation) to Hungerford and Milbrath during the 18-month period between June 2009 and December 2010.

238.    Bay-NOLA-Mgmt, controlled by Hungerford and Milbrath through Timone also made a payment in the amount of $6,035,000 to NobleOutReach (a company Hungerford and Milbrath wholly own), recorded on the books of Bay-NOLA-Mgmt as expenses for management fees, consulting expenses, financial analysis & consulting services, and project analysis.

239.    Through this transaction, Hungerford and Milbrath maintained an interest in immovable property and caused money misappropriated from the Fund's investors to be used by an entity in which they hold a controlling interest to acquire immovable property.

240.    Upon information and belief, NobleOutReach provided no such services to Bay-NOLA-Mgmt.  To the contrary, this transfer was intended solely to move the Fund's investment money into an entity controlled and operated by Hungerford and Milbrath who converted the payment for their ultimate personal benefit.

241.    No adequate explanation regarding the $6,035,000 payment or the services supposedly provided in consideration for this massive payment has been provided by any of NobleRealEstateFund, Bay-NOLA-Mgmt, NobleOutReach, Hungerford or Milbrath despite requests by Plaintiffs or Plaintiffs' agents since as early as August 2011.

242.    The failure to provide an explanation for this payment further supports Plaintiffs' claim that pre-suit demand on Noble-RealEstate-GP should be excused.

243.    The $6,000,300 payment from the Fund to Bay-NOLA-Mgmt was made as part of the scheme to defraud the Fund and obtain money from the Fund by means of gross mismanagement, misappropriation and conversion at the direction of Hungerford and Milbrath.

244.    The subsequent $6,035,000 payment from Bay-NOLA-Mgmt to NobleOutReach, a company in which Hungerford and Milbrath each own a fifty (50%) percent interest, was made solely as a means for Hungerford and Milbrath personally to profit from their scheme to divert

43

assets from the Fund and obtain money from the Fund by means gross mismanagement, misappropriation and conversion.

245.    Upon information and belief, NobleOutReach did not perform any legitimate service entitling it to a payment of $6,035,000 from Bay-NOLA-Mgmt.

246.    Bay-NOLA-Mgmt also paid Bay-NOLA-Ventures-MD $673,000 for the purchase of real estate in Maryland.

247.    Bay-NOLA-Mgmt obtained the money to purchase this real estate from the Fund through Hungerford and Milbrath.

248.    Bay-NOLA-Ventures-MD is wholly owned by Hungerford and Milbrath.

249.    Upon information and belief, the $673,000 purchase price paid by Bay-NOLA-Mgmt substantially exceeded the fair market value of the property in question.

250.    Upon information and belief, Hungerford and Milbrath pocketed the profits realized from the payment by Bay-NOLA-Mgmt to Bay-NOLA-Ventures-MD for their own personal use and benefit at the detriment of the Fund.

### *Payment of Fund Monies for Operating Expenses of the Regional Center*

251.    Defendants Hungerford and Milbrath used or caused to be used an additional $3 million in Fund monies by Bay-NOLA-Mgmt to pay for operating expenses of the Regional Center.

252.    This $3 million includes, *inter alia*, the following inappropriate expenditures: (a) $1.82 million for NobleOutReach employees (including Hungerford and Milbrath); and (b) day-to-day operating expenses for the NobleOutReach office located in Maryland, which is outside of the designated MOED Regional Center area.

253.    Upon information and belied, these expenditures directly benefited Hungerford and Milbrath at the direct expense and to the prejudice of the Fund.

### *Bay-Bourbon-Ritas, LLC*

254.    Hungerford and Milbrath caused the Fund to pay $900,100 for a ten (10%) percent interest in Defendant Bay-Bourbon-Ritas, LLC.

255.    Timone (ultimately wholly owned by Hungerford and Milbrath) owns the remaining ninety (90%) percent interest in Bay-Bourbon-Ritas, for which it paid no money.

256.    The Fund's $900,100 payment to Bay-Bourbon-Ritas represents all of the cash paid into this company.

257.    Bay-Bourbon-Ritas, in turn, paid out $850,000 to Defendant Ritas Fajitas NOLA, LLC for a seventy-six and one-half (76.5%) percent interest in Ritas Fajitas NOLA, LLC.

258.    Ritas Fajitas NOLA, LLC owns one hundred (100%) percent of Ritas Tequila Bar & Restaurant on Bourbon Street in New Orleans.

259.    Bay-Bourbon-Ritas recorded a loss of $643,900 on its investment in Ritas Fajitas NOLA, LLC.

260.    Thus, Hungerford and Milbrath caused the Fund to capitalize a project in which they ultimately own a majority ownership interest through their web of sham companies, while the Fund ended up with a mere ten (10%) percent ownership interest in exchange for making the entirety of the capital investments in the enterprise, which contributions were then funneled out of Bay-Bourbon-Ritas to companies owned or controlled by Hungerford and Milbrath.

261.    Upon information and belief, Hungerford and Milbrath personally benefitted from the series of payments to the various entities set forth above, which payments were ultimately funded by the initial $900,100 investment from the Fund.

### *VP NOLA, LLC*

262.    Hungerford and Milbrath caused the Fund to pay $4,055,300 for a ten (10%) percent interest in Defendant VP NOLA, LLC.

263.    Timone (which ultimately is wholly owned by Hungerford and Milbrath) paid a mere $100 for a thirty-five (35%) percent interest in VP NOLA, LLC.

264.    Defendant Bay-Algiers-JV, LLC (in which Hungerford and Milbrath jointly own a ninety-four (94%) percent interest) paid no money for a controlling fifty-one (51%) percent interest in VP NOLA, LLC.

265.    Defendant Noble Lodging Partners**,** which is likewise ultimately owned and controlled by Hungerford and Milbrath, has a 4% interest in VP NOLA, LLC.

266.    Thus, Hungerford and Milbrath ultimately hold a ninety (90%) percent interest in VP NOLA, LLC (for which they paid $100) while the Fund paid $4,055,300 for the remaining ten (10%) percent interest.

267.    Upon information and belief, Hungerford and Milbrath personally benefitted from the series of payments to the various entities set forth above, which payments were ultimately funded by the initial $4,055,300 investment from the Fund.

### *Noble-Franchise 1&3, LLC*

268.    Noble-Franchise 1&3, LLC ("Noble-Franchise 1&3") is a limited liability company that Hungerford and Milbrath formed on September 12, 2008.

269.    Hungerford and Milbrath caused the Fund to pay $500,000 for a forty-nine (49%) percent interest in Noble-Franchise 1&3.

270.    The remaining ownership interest in Noble-Franchise 1&3 is ultimately owned by Hungerford and Milbrath who, upon information and belief, paid little or no money for their controlling fifty-one (51%) interest in Noble-Franchise 1&3.

271.    Upon information and belief, Noble-Franchise 1&3 executed license agreements for the rights to develop two Value Place hotels.

272.    Upon information and belief, Noble-Franchise 1&3 is a sham company formed by Hungerford and Milbrath with the sole purpose of defrauding Plaintiffs.

273.    Upon information and belief, Noble-Franchise 1&3 is a worthless company with no assets that has provided no services entitling it to any money from the Fund.

274.    Upon information and belief, Hungerford and Milbrath have converted the Fund's $500,000 "investment" in Noble-Franchise 1&3 for their ultimate personal benefit.

275.    This pattern is repeated over and over again:  Hungerford and Milbrath "invested" the Fund's money in limited liability companies that they formed in the 2008 through 2010 period (none of which are disclosed in the PPMs) and for which they ultimately retain a controlling ownership interest.

276.    By contrast, the Fund is responsible for providing capital dollars for these entities and, in return, is given a small ownership interest in these various entities.

**Subsequent False Statements Made by Defendants regarding the Fund's Investments &
Threatened Viability of the Fund**

277.    In or around January 2012, the Fund issued a "WINTER 2011 UPDATE" regarding its various investments to Plaintiffs.  A true and correct copy of the WINTER 2011 UPDATE is attached hereto as **Exhibit "G"**.  This document was intended for and relied upon by Plaintiffs.

47

278.   The WINTER 2011 UPDATE was replete with false and misleading statements, including the following:

a.      information provided in the Fund's audited 2010 financial statements to the extent the statements refer to any of the limited liability companies (such as Bay-NOLA-Mgmt) as an "LLC investment";  the entities in which the Fund's monies were invested are sham companies that Hungerford and Milbrath formed for the sole purpose of misappropriating and converting Fund assets for the personal benefit of Hungerford and Milbrath;

b.      falsely describing the opening of Rita's Fajita and Tequila House as a "proven success," given that at the time this statement was made the Fund had invested $900,100 for only a ten (10%) percent ownership interest in Bay-Bourbon-Rita's, LLC, which, in turn, paid $850,000 for a seventy-six and one-half (76.5%) percent ownership interest in Rita's Fajitas NOLA, LLC, the holding company for the actual restaurant, which operation has since reported "losses" of hundreds of thousands of dollars.  This is not a "success" story, but another example of how Hungerford and Milbrath overpaid for minority interests in various limited liability companies with Fund monies where they stood to directly benefit from the investments, because they went to businesses that Hungerford and Milbrath ultimately owned and controlled, in this case through their ninety (90%) percent ownership in Bay-Bourbon-Rita's through Timone (which is wholly owned by Hungerford and Milbrath); and

c.      falsely stating that the Maurepas Foods restaurant is expected to open in the first quarter of 2012, given that at the time the statement was made the Fund did not have enough money to complete this project.

279.   In the WINTER 2011 UPDATE, Hungerford and Milbrath also informed Plaintiffs for the first time that "the failure of a resolution of the USCIS issues *may result in*

*liquidation of the Fund and the termination of the enterprise, and the potential ceasing of MOED Regional Center operations*." [*See* **Exhibit "G"** at p. 4 (emphasis added)].

280.    If the Fund is liquidated and the MOED Regional Center operations are terminated, USCIS will more than likely deny all pending I-829 Petitions and any subsequently submitted petitions.

281.    This will directly result in all thirty-one (31) investors in the Fund being subjected to deportation proceedings.

282.    Plaintiffs have spent the last two years building lives in the United States, including acquiring property (such as personal residences), sending their children to American schools, and building working careers here.

283.    The actions of Hungerford and Milbrath in diverting the Fund's assets and converting them for their own ultimate personal benefit have placed the continued viability of the Fund in jeopardy and will result in irreparable harm to the Fund if it collapses as an investment vehicle.

284.    In addition, Plaintiffs will be irreparably harmed if the Fund is liquidated because Plaintiffs will not be able to meet the requirements for obtaining permanent residency under the EB-5 Immigrant Investor Pilot Program.

## COUNT ONE

**(Derivative Claim on Behalf of the Fund for Breach of Fiduciary Duty Against Defendants Hungerford, Milbrath, and Noble-RealEstate-GP)**

285.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above as though fully set forth herein.

286.    Plaintiffs, as limited partners of the Fund, are excused from demanding that Noble-RealEstate-GP, as the general partner of the Fund, bring suit on behalf of the Fund, since

49

Hungerford and Milbrath are the controlling principals of noble-RealEstate-GP and are directly responsible for, involved in, and beneficiaries of the wrongdoing alleged herein, such that demand would be futile and provide Hungerford and Milbrath with additional opportunity to convert, divert, and/or conceal additional of the Fund's remaining assets that might otherwise be recoverable.

287.    Defendants Hungerford, Milbrath, and Noble-RealEstate-GP owed duties of care, undivided loyalty, honesty, fair dealing, and good faith to the Fund.

288.    Each of the foregoing Defendants had a fiduciary duty to refrain from usurping money from the Fund for their own personal benefit and gain.

289.    Each of the foregoing Defendants is liable to the Fund for the amount of the financial benefit received by them to which they are not entitled.

290.    The foregoing Defendants violated and breached the duties owed to the Fund through the following acts, including but not limited to:

a.      Defendant Noble-RealEstate-GP failed to contribute 0.5% of the total capital contributed by all the partners to the Fund;

b.      Defendants Noble-RealEstate-GP, Hungerford, and Milbrath engaged in a course of conduct that constitutes fraud, willful misconduct and/or gross negligence by transferring and ultimately converting over $6 million to Bay-NOLA-Mgmt, LLC in consideration for no services of equal value;

c.      Defendants Hungerford and Milbrath engaged in a course of conduct that constitutes fraud, willful misconduct and/or gross negligence by paying themselves a salary from Bay-NOLA-Mgmt, LLC for providing no services of equal value;

d.      Defendants Hungerford and Milbrath engaged in a course of conduct that constitutes fraud, willful misconduct and/or gross negligence by causing Bay-NOLA-Mgmt to transfer approximately $6 million to NobleOutReach for the sole purpose of converting these monies for their ultimate personal benefit;

e.      Defendants Hungerford and Milbrath used or caused to be used $3 million in Fund monies by Bay-NOLA-Mgmt to pay for the operating costs of the MOED Regional Center;

f.      Defendants Noble-RealEstate-GP, Hungerford, and Milbrath engaged in a course of conduct that constitutes fraud, willful misconduct and/or gross negligence by paying or causing to be paid $900,100 for a ten (10%) percent interest in Bay-Bourbon-Ritas, LLC while obtaining a majority ownership interest in Bay-Bourbon-Ritas for no consideration; and

g.      Defendants Noble-RealEstate-GP, Hungerford, and Milbrath engaged in a course of conduct that constitutes fraud, willful misconduct and/or gross negligence by paying or causing to be paid $4,055,300 for a ten (10%) percent interest in VP NOLA, LLC while obtaining a majority ownership in VP NOLA, LLC for no consideration.

h.      Defendants Noble-RealEstate-GP, Hungerford, and Milbrath by paying or causing to be paid $673,000 for the purchase of immovable property in Maryland to Bay-NOLA-Ventures-MD, a company wholly owned by Hungerford and Milbrath.

291.    As such, each of the foregoing defendants failed to act in good faith with the care an ordinarily prudent person in a like position would exercise under similar circumstances and in accordance with a reasonable belief that their conduct was in the best interest of the Fund as required by law, commonly accepted industry standards, and the LP Agreement.

## COUNT TWO

**(Derivative Claim on behalf of the Fund and Against Defendants
Hungerford, Milbrath, and Noble-RealEstate-GP for Gross Mismanagement)**

292.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above as though fully set forth herein.

293.    Plaintiffs are excused from demanding that Noble-RealEstate-GP, as the general partner of the Fund, bring suit on behalf of Plaintiffs, limited partners of the Fund, since Hungerford and Milbrath are the controlling principals of Noble-RealEstate-GP, are directly responsible for the wrongdoing alleged herein, and, thus, such demand would be futile and provide Hungerford and Milbrath with additional time to siphon all of the Fund's remaining assets.

294.    As a result of their positions, Defendants Hungerford, Milbrath, and Noble-RealEstate-GP owed a duty to the Fund and the Fund's limited partners to prudently manage the Fund's business operations and investment decisions.

295.    Defendants Hungerford Milbrath, and Noble-RealEstate-GP abandoned their duties with regard to prudently managing the Fund and thereby breached their duties of care and undivided loyalty in the management of the Fund.

296.    As a direct and proximate cause of the gross mismanagement of Defendants Hungerford and Milbrath, the Fund has sustained significant financial losses.

297.    Defendants Hungerford Milbrath, and Noble-RealEstate-GP are liable to the Fund for their gross mismanagement of the Fund and the resulting significant financial losses that the Fund incurred.

## COUNT THREE

**(Derivative Claim on behalf of the Fund and Against Defendants
Hungerford and Milbrath for Conversion and Misappropriation)**

298.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above as though fully set forth herein.

299.    Plaintiffs are excused from demanding that Noble-RealEstate-GP, as the general partner of the Fund, bring suit on behalf of Plaintiffs, limited partners of the Fund, since Hungerford and Milbrath are the controlling principals of Noble-RealEstate-GP, are directly responsible for the wrongdoing alleged herein, and, thus, such demand would be futile and provide Hungerford and Milbrath with additional time to siphon all of the Fund's remaining assets.

300.    Defendants Hungerford and Milbrath acquired possession of Fund assets in an unauthorized manner.

301.    Specifically, Defendants Hungerford and Milbrath invested, and continue to invest, Fund monies in sham companies that Hungerford and Milbrath control.

302.    Hungerford and Milbrath then divert the Fund's investments in these sham companies for their ultimate personal monetary gain to the detriment of the Fund.

303.    Hungerford and Milbrath caused, and continue to cause, the Fund's assets to be moved to companies that they control with the intent to exercise control over such assets.

304.    Hungerford and Milbrath transferred the Fund's assets without authority to do so since these transfers are fraudulent in nature and a violation of their fiduciary duty to the Fund.

305.    By virtue of these transfers to companies that Hungerford and Milbrath control, they have withheld ownership of these assets from their rightful owner, the Fund.

306.    Hungerford and Milbrath are altering, destroying, and/or wasting the Fund's

assets that they caused to be transferred to companies that they own and control.

307.    Hungerford and Milbrath are using the Fund's assets improperly in that they are diverting Fund assets for their ultimate personal benefit.

308.    Hungerford and Milbrath have wrongfully exercised authority over the Fund's assets, which are comprised of Plaintiffs' investment money, and have deprived the Fund of these assets.

309.    Accordingly, Hungerford and Milbrath are liable to the Fund for this conversion.

## COUNT FOUR

### (Derivative Claim Against All Defendants for Unjust Enrichment)

310.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above as though fully set forth herein.

311.    Plaintiffs are excused from demanding that Noble-RealEstate-GP, as the general partner of the Fund, bring suit on behalf of Plaintiffs, limited partners of the Fund, since Hungerford and Milbrath are the controlling principals of Noble-RealEstate-GP, are directly responsible for the wrongdoing alleged herein, and, thus, such demand would be futile and provide Hungerford and Milbrath with additional time to siphon all of the Fund's remaining assets.

312.    As a direct and proximate result of the acts alleged herein, the defendants wrongfully deprived the Fund of substantial assets and were unjustly enriched thereby.

313.    Furthermore, Defendants Hungerford and Milbrath were also unjustly enriched by their direct and indirect receipt and retention of financial benefits from the improper transactions alleged herein.

314.    It would be unjust under the circumstances for the defendants that benefitted from

Defendants Hungerford and Milbrath's gross mismanagement and/or fraud to retain such benefits.

315.   The defendants are liable to the Fund for such unjust enrichment and should be required to disgorge their unjust gains and return them to the Fund.

### COUNT FIVE

**(Derivative Claim on Behalf of the Fund for Intentional Interference with Contract Against Defendants Hungerford and Milbrath)**

316.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above as though fully set forth herein.

317.   Plaintiffs are excused from demanding that Noble-RealEstate-GP, as the general partner of the Fund, bring suit on behalf of Plaintiffs, limited partners of the Fund, since Hungerford and Milbrath are the controlling principals of Noble-RealEstate-GP, are directly responsible for the wrongdoing alleged herein, and, thus, such demand would be futile and provide Hungerford and Milbrath with additional time to siphon all of the Fund's remaining assets.

318.   The LP Agreement constitutes a contract or legally protected interest between the Fund and Noble-RealEstate-GP.

319.   Defendants Hungerord and Milbrath are the managing members of Noble-RealEstate-GP and served as managers and/or fiduciaries of Noble-RealEstate-GP.

320.   Hungerford and Milbrath intentionally induced or caused Noble-RealEstate-GP to breach the contracts and/or legally protected interests existing between it and Plaintiffs by, *inter alia*, causing Noble-RealEstate-GP to divert all or substantially all of Plaintiffs' investments for the use and benefit of Hungerford and Milbrath, rather than to provide financial returns for the Fund.

321.     Hungerford and Milbrath intentionally induced or caused the breaches by Noble-RealEstate-GP solely to benefit themselves and without justification at the direct expense of the Fund, in the process impoverishing the Fund and stripping it of assets needed to perform its intended purposes and functions, all without justification on the part of Hungerford and/or Milbrath.

322.     A contract or legally protected interest exists between the Fund and Noble-RE-Management, LLC for the provision of management services.

323.     Defendants Hungerford and Milbrath are managers and fiduciaries of Noble-RE-Management, LLC.

324.     Hungerford and Milbrath intentionally induced or caused Noble-RE-Management to breach its contractual obligations to the Fund administer and manage the reporting, tracking, and other management duties associated with the EB-5 immigration program requirements and otherwise breach its obligations as the Management Company for the Fund, all without justification.

325.     A contract or legally protected interest exists between the Fund and Bay-NOLA-Mgmt, LLC to provide services related to the Funds' investments.

326.     Defendants Hungerford and Milbrath are managers and fiduciaries of Bay-NOLA-Mgmt, LLC.

327.     Hungerford and Milbrath intentionally induced or caused Bay-NOLA-Mgmt to breach its obligations to the Fund without justification.

328.     A contract or legally protected interest exists between the Fund and NobleOutReach to provide services related to the Funds' investments.

329.    Defendants Hungerford and Milbrath are managers and fiduciaries of NobleOutReach.

330.    Hungerford and Milbrath intentionally induced or caused NobleOutReach to breach its obligations to the Fund without justification.

331.    The Fund has been damaged as a result of the aforesaid conduct by defendants Hungerford, and Milbrath by, among other things, the loss of all or substantially all of the Fund's assets; the loss of the use and value of those investments; the loss of future profits and/or future business opportunities; and other damages of such type and in such amounts as shall be demonstrated at trial.

## COUNT SIX

**(For Appointment of a Temporary and Permanent Receiver for Nominal Defendant NobleRealEstateFund, LP, the Louisiana Entity Defendants, the Delaware Entity Defendants and the Maryland Entity Defendants)**

332.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above as though fully set forth herein.

333.    The defendants are jeopardizing and continue to jeopardize the Fund's continued viability as a pooled investment vehicle by grossly mismanaging the Fund, engaging in blatant self-dealing to personally profit from the investments of the Plaintiffs, diverting Fund monies, and serving as conduits to funnel the Fund's assets to Hungerford and Milbrath.

334.    Through the actions and inactions of all defendants, Plaintiffs are also in danger of losing their status as Conditional Residents under the EB-5 Immigrant Investor Pilot Program, and being denied unconditional permanent residency, since the only projects that USCIS will consider for purposes of the job creation requirement have stalled.

335.    These projects have stalled directly as a result of the gross mismanagement, self-dealing, gross negligence, and outright fraud of all defendants, either directly or indirectly.

336.    In addition, in order to complete and submit their I-829 Petitions in a timely fashion, Plaintiffs will require, among other things, access to information currently in the defendants' possession.

337.    Unless Plaintiffs are granted access to information in defendants' possession and control, it is likely that Plaintiffs will not be able to complete their I-829 Petitions and/or USCIS will ultimately reject such petitions.

338.    Plaintiffs, as the limited partners of the Fund, seek the temporary and permanent appointment of a receiver to take charge of the property and management of the Fund to salvage the projects that have stalled.

339.    Plaintiffs further seek the temporary and permanent appointment of a receiver to take charge of the property and management of the Louisiana Entity Defendants, the Delaware Entity Defendants and the Maryland Entity Defendants.

340.    Plaintiffs request that the temporary receiver for all entity defendants perform an immediate accounting to ascertain what funds that have been misappropriated from the Fund should be returned.

341.    Plaintiffs also seek a preliminary and permanent injunction to enjoin all defendants and their officers and members (if applicable) from disposing of any money or property derived from or belonging to the Fund, including assets held personally by individual Defendants Hungerford and Milbrath.

342.    The Fund has an interest in property of the Louisiana Entity Defendants, the Delaware Entity Defendants and the Maryland Entity Defendants.

343.    All of the foregoing limited liability companies are and continue to be controlled, managed and operated by Defendants Hungerford and Milbrath.

344.    A receiver may be appointed to avert further loss of assets through waste and mismanagement.

345.    Defendants Hungerford and Milbrath have jeopardized and continue to jeopardize the continuing viability of the Fund by grossly mismanaging the Fund.

346.    Defendants Hungerford and Milbrath have further jeopardized and continue to jeopardize the continued viability of the Fund by wasting, misusing and converting the assets of the Fund through the Louisiana Entity Defendants, the Delaware Entity Defendants, and the Maryland Entity Defendants for their own ultimate personal benefit.

347.    Specifically, Defendants Hungerford and Milbrath formed the Louisiana Entity Defendants, the Delaware Entity Defendants, and the Maryland Entity Defendants for the sole purpose of serving as vehicles in which to carry out their scheme to convert Fund assets.

348.    The Court should appoint a temporary and permanent receiver over the Nominal Defendant, the Louisiana Entity Defendants, the Delaware Entity Defendants and the Maryland Entity Defendants to take charge of these companies' remaining property and assets to protect the Fund from further harm.

### DAMAGES SUFFERED BY NOBLEREALESTATEFUND, LP

349.    The foregoing misrepresentations, acts, and omissions of defendants were the direct and proximate cause of damages to the NobleRealEstateFund, L.P. for which the Fund is entitled to recover as follows:

      a.    The $6,000,300 payment made to Bay-NOLA-Mgmt, LLC;

      b.    The $3 million in Fund monies used to pay for operating expenses of the

New Orleans Regional Center;

c.     The $900,100 payment made to Bay-Bourbon-Ritas, LLC;

d.     The $4,055,300 payment made to Defendant VP NOLA, LLC.

e.     The $500,000 payment made to Noble-Franchise 1&3.

f.     All salaries paid to Defendants Hungerford and Milbrath from any of the Defendant companies or related companies;

g.     All management fees paid to Noble-RE-Management, LLC;

h.     All management fees paid directly or indirectly to Defendants Hungerford and/or Milbrath;

i.     All cash, assets, and anything else with tangible value that defendants diverted away from the Fund;

j.     All payments for any ownership interest in a company owned or controlled by either Defendant Hungerford or Defendant Milbrath;

k.     All excessive, improper, and/or illegal payments made to any of the defendants; and

l.     Such other damages as NobleRealEstateFund, LP has suffered as a result of the defendants' conduct.

## DEMAND FOR JURY TRIAL

350.    Plaintiffs demand trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that, upon due proceedings, judgment be rendered herein in their favor as follows:

1.  Immediately appointing a receiver to take charge of the affairs and property of nominal Defendant NobleRealEstateTrust, L.P. pending trial of this matter and to re-direct assets available to complete the existing job-creating projects to protect and/or preserve the Plaintiffs' immigration benefits;

2.  Appointing a permanent receiver to take charge of the affairs and property of Nominal Defendant NobleRealEstateTrust, LP, following trial of this matter;

3.  Immediately appointing a receiver to take charge of the affairs and property of the Louisiana Entity Defendants, the Maryland Entity Defendants and the Delaware Entity Defendants pending trial of this matter and to re-direct assets available to complete the existing job-creating projects to protect and/or preserve the Plaintiffs' immigration benefits that have been diverted to these entities;

4.  Appointing a permanent receiver to take charge of the affairs and property of the Louisiana Entity Defendants, the Maryland Entity Defendants and the Delaware Entity Defendants, following trial of this matter;

5.  Granting equitable and/or injunctive relief as permitted by applicable law and equity, preliminarily and permanently enjoining all Defendants from performing, making any payments or from conducting any further activities which will cause the Fund harm, including disposing of any money or assets that should be returned to the Fund;

6.  Awarding to the Fund money damages against all Defendants, jointly and severally, for all losses, injuries, and damages suffered by the Fund as a result of the defendants' state law violations, including statutory penalties, and prejudgment interest as appropriate;

7.  Awarding the Fund and/or Plaintiffs' counsel attorneys' fees and costs of suit as authorized by law and/or equity;

8.      Awarding the Fund interest on all amounts awarded herein from the date of judicial demand at the maximum rate permitted by law; and

9.      Awarding the Fund all other relief to which it may be permitted at law or in equity upon the premises hereof.

Respectfully submitted,

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ**

By:     _/s/ Kent A. Lambert_
        ROY C. CHEATWOOD, T.A. (#04010)
        KENT A. LAMBERT (#22458)
        BRIAN M. BALLAY (#29077)
        KATIE L. DYSART (#31449)
        SARAH K. CASEY (#32385)
        201 St. Charles Avenue, Suite 3600
        New Orleans, Louisiana  70170
        Telephone:  (504) 566-5200
        Facsimile:  (504) 636-4000

**ATTORNEYS FOR PLAINTIFFS**