## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TERENCE K. SUMPTER, et al.,**                    **CIVIL ACTION**
    **Plaintiffs**

**VERSUS**                                          **No. 12-717**

**WILLIAM B. HUNGERFORD, JR., et al.,**             **SECTION "E"**
    **Defendants**

### ORDER AND REASONS

Before the Court is defendant NobleOutReach, LLC's ("NOR") motion to disqualify plaintiffs' counsel.[1]  For the reasons set forth below, NOR's motion to disqualify is granted.

### BACKGROUND

### I.      The New Orleans Regional Center

Around the time Hurricane Katrina devastated the Gulf Coast region in 2005, defendants Bart Hungerford ("Mr. Hungerford") and Col. Tim Milbrath ("Col. Milbrath") entered into discussions with the City of New Orleans (the "City") regarding the possibility of creating a "Regional Center" in the City for the purpose of accepting and coordinating foreign investment in the City.  The proposed New Orleans Regional Center was advertised to the City as an investment opportunity for foreign investors looking to participate in a federal immigration pilot program (the "EB-5 Immigrant Investor Pilot Program" or the "EB-5 Program").  The EB-5 Program provides an opportunity for foreign nationals who contribute a certain amount of money to a for-profit business enterprise in the United States, and create a certain number of American jobs, to obtain legal permanent residency in the United States.

---

[1] R. Doc. 127.

1

To facilitate this mission and further propel negotiations with the City, Mr. Hungerford and Col. Milbrath, both principals in an entity called Noble-RealEstate-GP, created NOR in May 2006.[2]   NOR was specifically established "to contract with municipalities and others to facilitate investments via regional centers in investment projects and collect, manage and pool investments into limited partnership for a multitude of portfolio investment projects."[3] A few months later, in September 2006, the City entered into a Memorandum of Understanding ("MOU") with NobleReach-NOLA, LLC ("NobleReach"),[4] an NOR affiliate, authorizing NobleReach to act as the New Orleans Regional Center's principal agent, charged with promoting the Regional Center and soliciting and managing investments from foreign nationals interested in the EB-5 Program.[5]

After the MOU was signed, NOR worked with NobleReach to establish NobleRealEstateFund, LP ("the Fund") to serve as an entity into which foreign investors could invest their capital contributions in hopes of reaching the investment threshold required by the EB-5 Program and creating the requisite number of jobs.  NOR was also responsible for, among many other things, providing and preparing immigration advice to potential investors and assisting those investors with their immigration paperwork.  NOR

---

[2] Noble-RealEstate-GP is the general partner of the Fund.

[3] R. Doc. 127, Ex. 1.

[4] *See* R. Doc. 127, Ex. 2.

[5] During their negotiations with the City, Mr. Hungerford and Col. Milbrath learned the creation of a New Orleans Regional Center had been discussed sometime in the early 1990s, and that those discussions actually led to approval of the City as a Regional Center site, but that for some reason the previously approved New Orleans Regional Center project never got off the ground.  As a result, Mr. Hungerford and Col. Milbrath were required to renegotiate with the City and re-obtain all of the approvals necessary to get the project up and running again, which culminated in the September 2006 MOU.

created a series of documents that would be handed out to potential investors explaining the EB-5 Program, the Fund, and the risks and benefits of investing in the Fund.[6]  NOR also reported regularly to the City regarding the Regional Center and its progress.  An attorney named Rana Jazayerli ("Ms. Jazayerli") assisted NOR with these tasks. The nature of NOR's and Ms. Jazayerli's relationship is the subject of NOR's motion to disqualify, and will be discussed in detail below.

After a few years of relative success, in which NOR and the Fund accepted a number of substantial investments from foreign nationals in exchange for offering its assistance to those investors in obtaining conditional legal permanent resident status through the EB-5 Program, NOR and the Fund began to run into issues with United States Citizenship and Immigration Services ("USCIS"), the governmental agency charged with administering the EB-5 Program.  Specifically, in 2011, USCIS began denying several potential Fund investors' Form I-526 petitions for conditional residency, and, when USCIS denied the Form I-829 petition for permanent residency[7] of Terence Sumpter ("Mr. Sumpter"), the lead plaintiff in this case, NOR realized the USCIS issues had to be addressed immediately. In correspondence to NOR, USCIS questioned whether New Orleans was actually a Targeted Employment Area ("TEA"), such that the investment threshold was $500,000 instead of the typical $1,000,000 threshold, and USCIS also questioned whether the requisite number

---

[6] *See* R. Doc. 127, Ex. 3.

[7] The filing of a Form I-829 petition marks the final step for an investor seeking legal permanent residency in the United States through the EB-5 Immigrant Investor Pilot Program.  After filing a Form I-526 petition and being conditionally approved for legal permanent residency and an immigrant visa through the program, an investor must show, at the end of the two year conditional period, that he or she has, in fact, met the requirements of the program (i.e., that he or she has invested the requisite amount of money and created the requisite number of jobs).  If the investor successfully makes this showing, USCIS will approve his or her Form I-829 petition and the investor will thereafter be granted unconditional legal permanent resident status.

of jobs would actually be created.  As with the creation of the Fund and other NOR/Fund related issues, Ms. Jazayerli assisted NOR with these USCIS issues.  Again, the specific nature of Ms. Jazayerli's assistance will be discussed below.

## II.    The Instant Lawsuit

Sometime in late 2011, it became apparent the USCIS issues would not be resolved, and NOR informed its investors of the possibility that the Fund would have to liquidate and the Regional Center would have to cease operation.  A few months later, in early 2012,  and after attempting for several months to assist with the USCIS issues at the request of NOR, Ms. Jazayerli accepted a position with the law firm of Dilworth Paxson, LLP ("Dilworth Paxson").  Shortly thereafter, a group of dissatisfied Fund investors, including Mr. Sumpter and others,[8] brought this lawsuit as a derivative action, brought on behalf of the Fund, against NOR, Mr. Hungerford, Col. Milbrath, and a number of other entities, including the more than thirty limited liability companies created by Mr. Hungerford and Col. Milbrath in their roles as administrators and managing partners of the Fund.  The dissatisfied investor plaintiffs hired Ms. Jazayerli's new law firm, Dilworth Paxson, to serve as their lead counsel, as well as the New Orleans office of the law firm of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC ("Baker Donelson") to serve as local counsel.

In their complaint, plaintiffs claim that defendants never followed up on their promise to use the money invested to further the mission of the Fund and allow the investors to seek permanent residency through the EB-5 Program.  Instead, plaintiffs allege

---

[8] In addition to Mr. Sumpter, the plaintiffs in this action are Suzette P. Lopez, Abbas Barzani, Xue Li, Chong Kee Tan, Sandra Massie, Rong Zhou, Shuhai Li, Junjie Huang, Shuangmei Ge, Seyed Abad, Atefeh Abad, Xiao Tong Zhang, Wenjie Zhan, Li Wang, Li Wei Liu, Su Fang, Tianyi Liu, Ali Fuat Cercer and Faruk Cercer, Suat Ocal, Suheyla Ocal, Yiran Deng, Rong Ma, Ming Chen, Xirui Chen, and Reem Al Nasser.

defendants took the money invested and used it for their own gain and/or in other unnecessary and wasteful projects, in breach of their fiduciary duty to the Fund.  Plaintiffs assert ten state law derivative mismanagement and breach of fiduciary claims, as well as a derivative claim for violations of the Racketeer Influenced & Corrupt Organizations Act ("RICO").[9]  Plaintiffs allege this Court has jurisdiction over the subject matter in this case, pursuant to 28 U.S.C. § 1331, as a result of the federal RICO claim.[10]

---

[9] Plaintiffs' eleven causes of action are:

| | |
|---|---|
| (1) | a derivative action for breach of fiduciary duty on behalf of the Fund against Mr. Hungerford, Col. Milbrath, and NobleRealEstate; |
| (2) | a derivative action for gross mismanagement on behalf of the Fund against Mr. Hungerford, Col. Milbrath, and NobleRealEstate; |
| (3) | a derivative action for conversion and misappropriation on behalf of the Fund against Mr. Hungerford, Col. Milbrath, and NobleRealEstate; |
| (4) | a derivative action for unjust enrichment on behalf of the Fund against the wives of Mr. Hungerford and Col. Milbrath; |
| (5) | a derivative action for intentional interference with contract on behalf of the Fund against all defendants; |
| (6) | a derivative action for intentional interference with contract on behalf of the Fund against Mr. Hungerford and Col. Milbrath; |
| (7) | a derivative action for intentional interference with contract on behalf of the Fund against Mr. Hungerford and Col. Milbrath; |
| (8) | a derivative action for intentional interference with contract on behalf of the Fund against Mr. Hungerford and Col. Milbrath; |
| (9) | a derivative action for aiding and abetting the breach of fiduciary duty under LA. CIV. CODE ANN. art. 2324 on behalf of the Fund against NOR, Bay-NOLA-Mgmt, LLC, Bay-NOLAVentures-MD, LLC, Bay-Bourbon-Ritas, LLC, VP NOLA, LLC, Noble-Franchise 1&3, LLC, Bay-One-Capital, LLC, Bywater Holdings, LLC, and Bay-Algiers-JV, LLC; |
| (10) | a derivative action on behalf of the Fund for aiding and abetting conversion and misappropriation under LA. CIV. CODE ANN. art. 2324 against the "Entity Defendants"; |
| (11) | a  derivative action for RICO violations on behalf of the Fund against Mr. Hungerford, Col. Milbrath, Timone, Bartone, NOR, Noble-RealEstate-GP, Bay-NOLA-Mgmt, Bay-Bourbon-Ritas, VP NOLA, Noble-Franchise 1&3, Bay-One-Capital, Bywater Holdings; and |
| (12) | a derivative action for violation of the Louisiana Racketeering Act on behal of the Fund against Mr. Hungerford, Col. Milbrath, and Noble-RealEstate-GP. |

R. Doc. 102 (Amended Complaint); *see also* R. Doc. 110 (RICO Case Statement).

[10] Plaintiffs originally alleged that the Court had diversity jurisdiction as well as federal question jurisdiction, but defendants correctly note in their motion to dismiss that diversity is lacking.  Plaintiffs concede that diversity is lacking.  Thus, the only basis for the Court's jurisdiction is 28 U.S.C. § 1331.

In addition to the motion to disqualify that is the subject of this Order, the defendants have moved to dismiss this case under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[11]  In their motion to dismiss, defendants argue that plaintiffs' federal RICO claim is insufficiently pled, and thus the Court does not, in fact, have jurisdiction.  Plaintiffs oppose this motion to dismiss.[12]  While the Court recognizes that the motion to dismiss challenges the Court's jurisdiction over the subject matter in this case, NOR's motion to disqualify must still be resolved first in the interest of fairness and judicial economy, as plaintiffs' now-disqualified counsel will no longer be able to participate in this case and in the briefing related to the motion to dismiss.

### III.    Ms. Jazayerli's Relationship with NOR and the Parties' Arguments

With this brief overview of the complicated factual and procedural history of this case in mind, the Court now turns its attention to those facts critical to NOR's motion to disqualify; that is, the specific nature of Ms. Jazayerli's relationship with NOR and the alien investors turned plaintiffs in this case.

NOR argues that Jazayerli was NOR's attorney during all relevant times in this case, from the inception of the Fund to the creation and growth of the New Orleans Regional Center to the recruitment of investors, and that she remained NOR's attorney up until the time she left for Dilworth Paxson.  NOR concedes it did not always maintain a formal attorney-client relationship with Ms. Jazayerli, but argues that she, and everyone at NOR, believed Ms. Jazayerli was NOR's attorney.  In support of this argument, NOR attaches

---

[11] R. Doc. 112.

[12] R. Doc. 128.

6

affidavits of Mr. Hungerford,[13] Col. Milbrath,[14] and Noure Alo,[15] an attorney who represented an investor in the Fund and to whom Ms. Jazayerli represented herself as NOR's attorney.

NOR points to the following specific instances as supporting its argument that Ms. Jazayerli was and held herself out to be NOR's lawyer in connection with the Fund/Regional Center project before she left for Dilworth Paxson:

- Ms. Jazayerli signed a confidentiality agreement with NOR in February 2008.[16]

- Ms. Jazayerli provided NOR with content to include in quarterly reports to the City pursuant to the MOU.[17]

- Ms. Jazayerli provided legal counsel and reviewed documents for legal accuracy about USCIS and the immigration process before those documents were sent to potential investors.[18]  NOR says it considered Ms. Jazayerli its expert on these issues.  Ms. Jazayerli also edited other NOR offering documents for potential investors.[19]

- Ms. Jazayerli advised NOR and potential investors as to how to properly complete paperwork to become a limited partner in the Fund.[20]
- Ms. Jazayerli advised NOR about the USCIS' processes and policies.[21]

- Ms. Jazayerli introduced herself and held herself out to be NOR's attorney

---

[13] R. Doc. 131.

[14] R. Doc. 132.

[15] R. Doc. 133.

[16] R. Doc. 127, Ex. 4.

[17] R. Doc. 127, Ex. 6.

[18] R. Doc. 127, Ex. 5.

[19] *Id.*

[20] R. Doc. 127, Ex. 8.

[21] *See* R. Doc. 127, Ex. 7.

during a June 2009 trip to China to recruit potential investors.[22]

- Ms. Jazayerli represented NOR during its negotiations with USCIS after issues arose with Mr. Sumpter's petition. Ms. Jazayerli gave NOR arguments to use to respond to USCIS.[23] Ms. Jazayerli drafted a letter for NOR to send to the Louisiana Attorney General's Office seeking assistance with USCIS.[24] Ms. Jazayerli also drafted a memorandum for NOR regarding NOR's response to USCIS' argument that New Orleans no longer qualified as a TEA.[25] In addition, Ms. Jazayerli communicated with congressional staffers directly with respect to the USCIS issue. Finally, Ms. Jazayerli advised NOR when it received a Request for Evidence ("RFE") from USCIS regarding Mr. Sumpter's petition.[26] NOR paid Ms. Jazayerli directly for her services relating to the RFE.[27]

NOR argues that all of these facts show that Ms. Jazayerli previously represented NOR in connection with the Fund and the New Orleans Regional Center, and thus she has a conflict of interest in this case preventing her from representing plaintiffs in a case dealing directly with the Fund and the New Orleans Regional Center, which disqualification is then imputed to the entire Dilworth Paxson law firm. NOR also argues that Ms. Jazayerli's involvement with Dilworth Paxson has "tainted" Baker Donelson, such that Baker Donelson should also be disqualified.

Plaintiffs argue that NOR never had an attorney-client relationship with Ms. Jazayerli, and thus no conflict of interest exists and disqualification is not warranted.[28]

---

[22] *See* R. Doc. 127, Ex. 9.

[23] R. Doc. 127, Ex. 10.

[24] R. Doc. 127, Ex. 11.

[25] R. Doc. 127, Ex. 12.

[26] R. Doc. 127, Ex. 13.

[27] *See id.* This is the only instance in which NOR paid Ms. Jazayerli directly for her services. NOR explains that typically, Ms. Jazayerli was compensated directly by potential investors for her services, and that, in lieu of traditional compensation, NOR offered Ms. Jazayerli a number of client referrals.

[28] *See generally* R. Doc. 136 (Plaintiffs' opposition to NOR's motion to disqualify).

Instead, plaintiffs characterize Ms. Jazayerli's services for NOR as marketing/advertising work as compared to the legal work she performed for the individual investors.  Plaintiffs argue the alien investors understood that Ms. Jazayerli worked for them and not for NOR.

In support of their argument that Ms. Jazayerli and NOR did not have an attorney-client relationship, plaintiffs also downplay Ms. Jazayerli's contacts with NOR and argue that Ms. Jazayerli's role in the early years of NOR - whatever that role may be - does not bear a substantial relationship to the current litigation.   Plaintiffs point to the fact that all potential investors had to sign the same confidentiality agreement signed by Ms. Jazayerli; the fact that Ms. Jazayerli paid her own way to China; the fact that Ms. Jazayerli never offered any "formal" advice to NOR; and the fact that none of the information provided by NOR to Ms. Jazayerli was actually confidential.  With respect to the USCIS issues, plaintiffs argue Ms. Jazayerli's negotiations with USCIS were in collaboration with, but not for, NOR. Plaintiffs do concede, however, that Ms. Jazayerli provided paid legal services to NOR in the form of her assistance with Mr. Sumpter's RFE.

Plaintiffs argue that under Louisiana law, an express agreement is required to establish an attorney-client relationship, and in the absence of a written agreement, only a reasonable subjective belief in such a relationship will suffice to establish such a relationship.  Plaintiffs say that any belief NOR may have had that Ms. Jazayerli was its attorney was unreasonable, except for with respect to the limited task of NOR's payment to Ms. Jazayerli for responding to Mr. Sumpter's RFE.  Plaintiffs also contend that NOR's conduct during the time in question belies the arguments now set forth by NOR.  Plaintiffs say the fact that NOR actually had other attorneys under retainer agreement, the fact that NOR would tell potential investors that they needed an independent immigration attorney,

such as Ms. Jazayerli, and the fact that NOR did not make Ms. Jazayerli privy to its confidential communications, all show that NOR did not reasonably believe Ms. Jazayerli was its lawyer, and thus any argument to the contrary at this point is merely a tactical ploy. Finally, plaintiffs argue that Ms. Jazayerli never thought she was NOR's lawyer, nor did she ever hold herself out as such. In support of their opposition, plaintiffs attach affidavits from Alan McCain,[29] an NOR employee, Chong Kee Tan,[30] an immigrant investor and plaintiff in this case, Vivian Jiang,[31] another attorney who took on immigrant investor clients with Ms. Jazayerli, and Ms. Jazayerli herself.[32]

        In response to plaintiffs' opposition, NOR submitted a reply in which it largely rehashes its arguments from its original motion.[33]  NOR focuses on Ms. Jazayerli's "admitted attorney-client relationship" with NOR regarding Mr. Sumpter's RFE.  NOR says that if the Court determines that her representation in that connection is substantially related to this case, disqualification is warranted and the Court need not inquire any further.  NOR argues the plaintiffs are mis-characterizing  their own claims to avoid revealing that their allegations are substantially related to Ms. Jazayerli's representation of NOR.  Finally, NOR contends that it does not matter whether Ms. Jazayerli thought NOR was her client, because what matters is whether NOR thought she was its lawyer.  In

---

[29] R. Doc. 137.

[30] R. Doc. 138.

[31] R. Doc. 139.

[32] R. Doc. 140.

[33] R. Doc. 143.

support of its reply, NOR attaches a supplemental affidavit from Mr. Hungerford[34] and affidavits from Chandrashekar Challa[35] and Rong Liang Liou,[36] a foreign lawyer and "investor promoter," respectively, who met with Ms. Jazayerli regarding the Fund and the New Orleans Regional Center and who both state that Ms. Jazayerli held herself out to be NOR's attorney when she met with them.

Plaintiffs' sur-reply reiterates that this is not a legal or immigration malpractice case, but a shareholder derivative lawsuit alleging bad business practices, and thus Ms. Jazayerli's involvement in NOR's activities is not substantially related to this lawsuit.[37] Plaintiffs admit Ms. Jazayerli represented NOR with respect to Mr. Sumpter's RFE, but again, plaintiffs contend the scope of that representation was extremely narrow.  In support of their sur-reply, plaintiffs attach a supplemental affidavit from Ms. Jazayerli.[38]

## ANALYSIS

### I.    Motion to Disqualify Standard

"Motions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law." *In re American Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992), *cert. denied*, 507 U.S. 912 (1993).  As such, and because disqualification of an attorney is a harsh and disruptive remedy, the party seeking disqualification bears the burden of proving a conflict of interest requiring

---

[34] R. Doc. 143, Ex. 1.

[35] R. Doc. 143, Ex. 2.

[36] R. Doc. 143, Ex. 3.

[37] *See* R. Doc. 146.

[38] R. Doc. 146-1.

disqualification.  *See United States v. DeCay*, 406 F. Supp. 2d 679, 683 (E.D. La. 2005) (citing *F.D.I.C. v. U.S. Fire. Ins. Co.*, 50 F.3d 1304, 1316 (5th Cir. 1995)). When faced with a motion to disqualify counsel, the Court must consider the applicable rules of professional conduct and applicable case law to determine if a conflict exists and if disqualification would be an appropriate remedy.   This process requires the Court to undertake "painstaking analysis of the facts and precise application of precedent." *Brennan's, Inc. v. Brennan's Rests., Inc.*, 590 F.2d 168, 173-74 (5th Cir. 1979).

First, the Court looks to the "local rules promulgated by the Court itself."  *U.S. Fire Ins. Co.*, 50 F. 3d at 1312.  The Local Rules for the Eastern District of Louisiana (the "Local Rules") incorporate the Rules of Professional Conduct of the Louisiana State Bar (the "Louisiana Rules").   *See* LR 83.2.3.  However, because the Court reserves the right to diverge from the Louisiana Rules, the Louisiana Rules are not the "sole authority" governing motions to disqualify.  *U.S. Fire Ins. Co.*, 50 F.3d at 1312.   Thus, while the Louisiana Rules  are recognized as having the force and effect of substantive law, a motion to disqualify counsel is "governed by the ethical rules announced by the national profession in light of the public interest and the litigants' rights."  *American Airlines*, 972 F.2d at 614. As such, in evaluating NOR's motion, the Court also considers the American Bar Association's Model Rules of Professional Conduct (the "Model Rules") and the American Bar Association's Model Code of Professional Conduct (the "Model Code").[39]  *See Horaist v. Doctor's Hospital of Opelousas*, 255 F.3d 261, 266 (5th Cir. 2001).  In addition, the Court considers whether an attorney's conflict has the appearance of impropriety or creates a

---

[39] The Local Rules, the Louisiana Rules, the Model Rules, and the Model Code are all identical with respect to the issues presented by NOR's motion.

possibility that a specific impropriety will occur, and the Court considers whether "the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case." *In re Dresser Industries*, 972 F.2d 540, 543–44 (5th Cir. 1992) (citing *Woods v. Covington County Bank*, 537 F.2d 804, 812-13 (5th Cir. 1976)).

"Ideally, conflict of interest problems should be settled between the attorney and his client . . . [however,] it is generally proper for an opposing party to bring conflict of interest matters to the attention of the court." *U.S. Fire Ins. Co.*, 50 F.3d at 1315. Indeed, "[a] disqualification inquiry, particularly when instigated by an opponent, presents a palpable risk of unfairly denying a party the counsel of his choosing. Therefore, notwithstanding the fundamental importance of safeguarding popular confidence in the integrity of the legal system, attorney disqualification . . . is a sanction that must not be imposed cavalierly." *Id.* at 1316. Even still, under certain circumstances, disqualification may be the Court's only option when faced with a conflict of interest problem. *American Airlines*, 972 F.2d at 614.

## II.    Relevant Rules of Professional Conduct

Louisiana Rules 1.9 and 1.10 are relevant to this motion. Louisiana Rule 1.9 provides the ethical considerations and professional responsibility rules regarding a lawyer's duty to a former client.[40] Louisiana Rule 1.10 imputes a lawyer's disqualification under Rule 1.9

---

[40] Rule 1.9 provides as follows:

> (a)    A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.
>
> (b)    A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

to all the lawyers in the lawyer's law firm.[41]  In the Fifth Circuit, the so-called "substantial relationship" test governs disqualification under Rule 1.9(a) based on a former representation and imputed disqualification under Rule 1.10(a). In *In re American Airlines*, the Fifth Circuit summarized the two elements of the substantial relationship test as follows:

> A party seeking to disqualify opposing counsel on the ground of a former representation must establish two elements:
>
> (1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify; and

---

(1) whose interests are materially adverse to that person; and

(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

LA. RULES OF PROF'L CONDUCT 1.9.

[41] Rule 1.10 provides, in part, as follows:

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

LA. RULES OF PROF'L CONDUCT 1.10(a).

> (2)   a substantial relationship between the subject matter of the former and present representations.

*American Airlines*, 972 F.2d at 614 (citing *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1569 (5th Cir.1989)). "Inherent in the substantial relationship test is a fundamental concern with protecting the client's interest in the loyalty of his attorney . . . Once it is established that the prior matters are substantially related to the present case, the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation." *Mike Hooks Dredging Co., Inc. v. Eckstein Marine Serv., Inc.*, No. 08-3945, 2010 WL 3081310, at *2 (E.D. La. Aug. 5, 2010) (internal citations and quotation marks omitted). The substantial relationship test is "categorical in requiring disqualification once a substantial relationship between past and current representations is established." *American Airlines*, 972 F.2d at 614.

Accordingly, the Court must consider whether the two elements of the substantial relationship test are met in this case. If both elements are met, disqualification is the Court's only option. *American Airlines*, 972 F.2d at 614.

### III.   Application of the Substantial Relationship Test to this Case

#### A.   An Attorney-Client Relationship Existed Between NOR and Ms. Jazayerli

In *In re Austin*, 06-630 (La. 11/29/06); 943 So.2d 341, the Supreme Court of Louisiana applied the test contained in the Restatement (Third) of the Law Governing Lawyers to determine if an attorney-client relationship existed. *Id.* at 347. According to the Restatement (Third) of the Law Governing Lawyers, an attorney-client relationship arises when:

15

     (1)    a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either

          (a)    the lawyer manifests to the person consent to do so; or

          (b)    the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services; or

     (2)    a tribunal with power to do so appoints the lawyer to provide the services.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14 (2000).  The existence of an attorney-client relationship turns largely on the client's subjective belief that such a relationship exists.  *La. State Bar Ass'n v. Bosworth*, 481 So.2d 567, 571 (La. 1986); *Austin*, 943 So.2d at 348 (the Louisiana Supreme Court "has given great deference to the client's subjective belief whether an attorney-client relationship exists.")  "Nonetheless, the overarching question is whether there is a reasonable, objective basis to determine that an attorney-client relationship has formed." *Austin,* 943 So.2d at 348; *Williams v. Roberts*, 931 So.2d 1217, 1220-21 (La. App. 3d Cir.2006) ("even though whether an attorney-client relationship exists turns largely on one's subjective belief that it does, a person's subjective belief that an attorney represents him must be reasonable under the circumstances.").

     In this case, there is no question that Ms. Jazayerli and NOR had an attorney-client relationship with respect to the work requested by NOR and performed by Ms. Jazayerli regarding Mr. Sumpter's RFE.  NOR obviously manifested its intent to have Ms. Jazayerli serve as its lawyer to help deal with the RFE when it requested that she do so in exchange for monetary compensation, an assignment which Ms. Jazayerli accepted and completed

16

and for which she received compensation.  Plaintiffs argue that Ms. Jazayerli's work on this issue "cannot reasonably be construed as providing legal advice" because Ms. Jazayerli made only small changes to NOR's response to Mr. Sumpter's RFE.  The Court specifically rejects this argument.  The magnitude of the changes she made to the response does not lessen the fact that she was hired to provide legal services for NOR.  The Court finds the first prong of the substantial relationship test is clearly met with respect to Ms. Jazayerli's representation of NOR in connection with Mr. Sumpter's RFE.  For purposes of NOR's motion to disqualify, the fact that Ms. Jazayerli represented NOR in connection with the RFE is sufficient to create a conflict of interest under Louisiana Rule 1.9, which disqualification is imputed to Baker Donelson and Dilworth Paxson.

     In addition to Mr. Sumpter's RFE, NOR clearly manifested its intent to have Ms. Jazayerli serve as its attorney, albeit without a formal attorney-client agreement in place, in connection with a number of other Fund-related issues, from the initial formation of the Fund to recruitment of potential investors to dealing with USCIS on behalf of NOR as a whole.  Ms. Jazayerli now attempts to distance herself from NOR, arguing she worked only for the investors individually and not for NOR.  The Court recognizes there were instances in which Ms. Jazayerli did, in fact, attempt to explain to potential investors that she was not NOR's lawyer.  However, the first prong of the substantial relationship test asks first whether the client manifested an intent to have an individual serve as its lawyer, which standard is clearly satisfied in this case.  The next prong is whether the lawyer consented to that relationship or expressly denied it.  In this case, the record evidence demonstrates that, even assuming Ms. Jazayerli never expressly consented to an informal attorney-client relationship, she never clearly manifested a lack of consent to NOR which is what is

17

required by Louisiana law.  The Court finds NOR's belief that Ms. Jazayerli was its attorney in connection with all Fund-related issues, including Mr. Sumpter's RFE, to be reasonable, and that Ms. Jazayerli should have known that NOR would hold such a belief, given the kinds of work NOR requested Ms. Jazayerli - and only Ms. Jazayerli - perform on its behalf, and the work actually performed by Ms. Jazayerli.

### B.   A Substantial Relationship Exists Between the Subject Matter of Ms. Jazayerli's Prior Representation of NOR and the Current Litigation

The Court now turns to the issue of whether a substantial relationship exists between the subject matter of Ms. Jazayerli's previous representation of NOR and the current litigation for which her new law firm represents several of the parties.  Again, the Court will first discuss whether such a relationship exists between the subject matter of Ms. Jazayerli's formal representation of NOR in connection with Mr. Sumpter's RFE and this case, and then discuss whether such a relationship exists in a broader context.

As with the first prong of the substantial relationship test, "[t]he party who seeks to disqualify his former lawyer bears the burden of proving that the present and former representations are substantially related." *Parker v. Rowan Cos., Inc.*, No. 03-545, 2003 WL 22852218, at *5 (E.D. La. Nov. 15, 2003) (citing *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1028 (5th Cir. 1981); *American Airlines*, 972 F.3d at 614).  The Louisiana Supreme Court defines the term "substantially related," in the context of disqualification under Louisiana's rules of professional conduct, as follows: "In our view, two matters are 'substantially related' when they are so interrelated both in fact and substance that a reasonable person would not be able to disassociate the two." *Walker v. La. Dep't of Transp. & Development*, 01-2078 (La. 5/14/02);  817 So. 2d 57, 62; *see also*

*Parker*, 2003 WL 22852218, at *10 ("[T]he substantial relationship test requires common subject matters, issues and causes of action, but it does not require the same factual scenarios in both cases.")  Once it is established that a lawyer's previous representation of a client is substantially related to a current representation of a different client, "the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation." *American Airlines*, 972 F.3d at 614 (citing *Duncan*, 646 F.2d at 1028).

As recognized by Judge Vance in *Parker*, "[t]he Fifth Circuit has applied the substantial relationship test to address attorney disqualification in cases that fall along a continuum, from those in which the linkage is clear to those in which the connection is nebulous and superficial."  2003 WL 22852218, at *5. Judge Vance's in-depth analysis of the cases along this spectrum is instructive in this case, as she carefully analyzed the facts of a number of Fifth Circuit cases in an attempt to understand exactly what the Fifth Circuit requires before the substantial relationship test is met.[42]  *See id.*, at *5-7.  After undergoing

---

[42] *Compare Duncan*, 646 F.2d at 1028-29 (defendant failed to meet its burden to establish the requisite substantial relationship, because, after examining "the precise nature of the relationship between the present and former representations" and engaging in a "painstaking analysis of the facts and [a] precise application of precedent," the Fifth Circuit found that simply representing a client for a period of time on similar legal issues is not sufficient when the issues in the instant case bear little more than a "superficial resemblance" to the issues in the former representation); *with In re Corrugated Container Antitrust Litig.*, 659 F.2d 1341, 1343-46 (5th Cir. 1981) (upholding disqualification of defense counsel, noting that the district court had identified two specific issues common to the instant case and the firm's former representation of the plaintiff in the instant case and rejecting a strict test of relevance by requiring only that the advice given in the two representations be "akin to the present action in a way reasonable persons would understand as important to the issues involved"); *American Airlines*, 972 F.2d at 628 (issuing writ of mandamus directing the district court to disqualify plaintiff's counsel after identifying specific issues and subject matters that were common to both the former and current representations, even though the causes of action were not the same, because they were so closely related).

In *Parker*, Judge Vance also explored a number of Eastern District of Louisiana cases falling along this same spectrum.  *Compare Hampton v. Daybrook Fisheries,* No. 01-1913, 2001 WL 1444933, at *3-4 (E.D. La. 11/14/01) (denying motion to disqualify) *with Fortner v. Int'l Diving & Consulting Svcs., Inc.*, No. 95-1035, 1996 WL 50807, at *2-3 (E.D. La. 2/8/96) (granting motion to disqualify); *Consolidated Grain & Barge Co., Inc. v. M/V CSS Atlanta*, No. 99-687, 2000 WL 977606, at *3-4 (E.D. La. 7/14/00) (same).

this exhaustive review of precedent, Judge Vance turned to the case before her in *Parker* and granted defendant's motion to disqualify plaintiff's counsel, noting specifically that plaintiff's counsel had previously offered specific legal advice to defendant on legally similar matters and that defendant viewed plaintiff's counsel as "part of its team" of lawyers for general legal advice and explicitly rejecting the plaintiff's argument that those former representations dealt with different factual issues. *Id.* at *9-10.  Judge Vance made a point of noting the fact that plaintiff's counsel provided general advice to defendant in the past was not, in and of itself, sufficient to meet the second prong of the substantial relationship test, but that, because there was evidence that plaintiff's counsel also provided specific legal advice in the past, evidence of a more general relationship bolstered the conclusion that disqualification was necessary. *Id.* at *10.

The subject matter of Ms. Jazayerli's former representation of NOR bears a striking resemblance to the current litigation; this is especially true with respect to Ms. Jazayerli's formal representation of NOR in connection with Mr. Sumpter's RFE.  Despite plaintiffs' arguments to the contrary, it is clear to the Court that the issues surrounding the RFE - the fact that USCIS doubted New Orleans' continued TEA status and the Fund's potential for successfully achieving the goals it advertised to potential investors - are substantially similar to certain of the plaintiff's financial mismanagement and racketeering claims; indeed, some of the racketeering allegations in plaintiffs' RICO Case Statement and federal and state racketeering causes of action are virtually identical to the issues raised in the RFE. Certainly the issues at hand relative to Ms. Jazayerli's representation of NOR regarding the RFE are "akin" to the issues in the present action in the way a reasonable person would understand.  *See American Airlines*, 972 F.2d at 618-19.

20

Just as Judge Vance could not ignore the record evidence in *Parker*, this Court cannot ignore the record evidence indicating that Ms. Jazayerli consistently offered advice to NOR on a number of issues with respect to NOR's business practices, NOR's interactions with potential investors and the City, and NOR's interactions with USCIS, all of which are now directly at issue in this case.   NOR's allegations regarding Ms. Jazayerli's informal status as NOR's "go to" immigration attorney may not, by themselves, be sufficient to meet the second prong of the substantial relationship test, and in *Parker*, Judge Vance noted that general allegations that an attorney used to be "a part of the team" are not generally sufficient. *See Parker*, 2003 WL 22852218, at *10.   However, this case is an even stronger candidate for disqualification than *Parker*. In this case, NOR has not only offered very specific allegations regarding the work it requested of Ms. Jazayerli over the course of the Fund's short life span and the work she performed on its behalf, but NOR has also clearly satisfied both prongs of the substantial relationship test with respect to Ms. Jazayerli's representation of NOR in connection with the RFE.   In this context, NOR's general allegations of an ongoing relationship in which it regularly sought advice from Ms. Jazayerli serves to bolster the Court's conclusion that the substantial relationship test is met in this case, and, because the test has been met, the  Court irrebuttably presumes NOR provided Ms. Jazayerli with confidential information during her former representation, and she is thus disqualified as counsel in this case.  Plaintiffs argue time and again that Ms. Jazayerli never received confidential information during her time with NOR, even during the time she spent as retained counsel for Mr. Sumpter's RFE.  However, this argument cannot stand in this case, because the fact that the substantial relationship test is met gives rise to an irrebuttable  presumption  that  Ms. Jazayerli  did,  in  fact,  receive  such  confidential

information.  No amount of argument to the contrary will be able to rebut an irrebuttable presumption such as this.  *See American Airlines*, 972 F.2d at 614.

The second prong of the substantial relationship test is met in this case.  To the extent NOR's motion seeks disqualification of Ms. Jazayerli as plaintiffs' counsel in this matter, the motion is granted.

### IV.    Plaintiffs' Counsel Must All be Disqualified

While Ms. Jazayerli is disqualified as counsel in this case, she is not counsel of record for plaintiffs, so the Court now turns to the issue of whether Ms. Jazayerli's mandatory disqualification extends to her firm and to plaintiffs' local counsel.  For the reasons set forth below, the Court finds that her disqualification must be extended to both firms.

### A.    Ms. Jazayerli's Disqualification is Imputed to Dilworth Paxson

In addition to the irrebuttable presumption that NOR and Ms. Jazayerli exchanged confidential information during Ms. Jazayerli's previous representation of NOR, a second irrebuttable presumption also applies now that the substantial relationship has been established; that is, that "confidences obtained by an individual lawyer will be shared with the other members of his firm." *American Airlines*, 972 F.2d at 614 n. 1; *see also Corrugated Container*, 659 F.2d at 1346; *Burnett v. Olson*, No. 04-2200, 2005 WL 711602, at *6 (E.D. La. Mar. 18, 2005).  Whether or not such confidences gained during a previous representation are actually shared during the current representation is immaterial to the Court's analysis.  *Brennan's*, 590 F.2d at 172.  Considering the irrebuttable presumption that Ms. Jazayerli shared NOR's confidences during her prior representation with her fellow Dilworth Paxson attorneys, and the plain language of Louisiana Rule 1.10, which

22

automatically disqualifies all lawyers in a law firm when one attorney in the firm is disqualified, the Court has no choice but to disqualify the entire Dilworth Paxson firm as plaintiffs' counsel in this case.   To the extent NOR's motion to disqualify seeks disqualification of Dilworth Paxson as plaintiffs' counsel in this case, the motion is granted.

### B.     Dilworth Paxson's Disqualification Taints Baker Donelson's Representation of Plaintiffs

Finally, the Court turns to the question of whether Ms. Jazayerli's and Dilworth Paxson's automatic disqualification as counsel in this case means that Baker Donelson, plaintiffs' local counsel and a firm in which all parties agree Ms. Jazayerli has no direct affiliation, is also disqualified.   NOR concedes it has no evidence that Ms. Jazayerli provided NOR's confidential information to any Baker Donelson attorney, but it nonetheless argues that if Dilworth Paxson is disqualified in this case, Baker Donelson must also be disqualified.   Plaintiffs argue that NOR has not met the substantial relationship test for Baker Donelson and thus disqualification is neither mandatory nor appropriate.

While the Court recognizes this Order will leave plaintiffs without their chosen counsel through no fault of their own, the Court agrees with NOR that disqualification of Baker Donelson is  unavoidable in this case.  If Dilworth Paxson is disqualified but Baker Donelson is not, the appearance of impropriety will continue to linger, and the Court finds the social interests served by Baker Donelson's continued participation in this case are minimal when compared with the significant risk that the firm's continued participation in this case will raise public suspicion for the duration of this litigation.  *See Dresser*, 972 F.2d at 543–44.  Even if NOR's motion to disqualify is a tactical move, the Court nevertheless finds its obligation to maintain the integrity of the judicial process compels nothing less

than disqualification of all law firms associated with Ms. Jazayerli, including Baker Donelson, in connection with this case. To the extent NOR's motion to disqualify seeks disqualification of Baker Donelson as plaintiffs' counsel in this matter, the motion is granted.

## CONCLUSION

The Court appreciates the parties' attempts to settle their differences in an amicable fashion, but, now that the Court has been asked to intervene, the Court finds disqualification of plaintiffs' counsel is unavoidable in this case. The Court does not impose this remedy, which is essentially a sanction, lightly, and the Court is fully aware this Order may have some prejudicial effect on plaintiffs, but the Court also recognizes that, to date, very little of substance has been done in this case, so any prejudicial and/or dilatory effect of this order is less significant than it otherwise could have been. The Court is confident that plaintiffs, and the judicial process, will be best served by the Court's removal of the appearance of impropriety that will be associated with this case if Dilworth Paxson and Baker Donelson were allowed to remain as counsel of record.

Accordingly, **IT IS ORDERED** that NOR's motion to disqualify be and hereby is **GRANTED.**

**IT IS FURTHER ORDERED** that the law firms of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC and Dilworth Paxson, LLP be and hereby are **DISQUALIFIED** as counsel for plaintiffs in this matter.

**IT IS FURTHER ORDERED** that plaintiffs shall enroll new counsel of record in this matter within **forty-five (45) days** of the entry of this Order.

**IT IS FURTHER ORDERED** that, because it was filed by counsel that has been

disqualified, plaintiffs' opposition to defendants' motion to dismiss for lack of jurisdiction be and hereby is **STRICKEN** from the record.

   **IT IS FURTHER ORDERED** that this matter be and hereby is **STAYED** until plaintiffs enroll new counsel.

   **IT IS FURTHER ORDERED** that the Court will hold a telephone status conference on **July 23, 2013**, at **2:00 p.m.**  The Court will provide call-in information prior to this conference.  Plaintiffs' new counsel of record will be given a deadline to file a new response to the pending motion to dismiss at this conference.

   Nothing in this Order is to be construed as the Court taking a position on the merits of this case at this time.

   **New Orleans, Louisiana, this** <u>20th</u> **day of May, 2013.**

                   _____
                    **SUSIE MORGAN**
           **UNITED STATES DISTRICT JUDGE**